WARNER COMMUNICATIONS, INC., Atari Holdings, Inc., Texas Builders, Mark O'Brien, Tim O'Brien, Gerald O'Brien and Marvin Oates, Appellants,

v.

James A. KELLER, d/b/a James A. Keller Realtors, Appellee.

No. 08–93–00183–CV.

Court of Appeals of Texas, El Paso.

Nov. 23, 1994.

Rehearing Overruled Dec. 21, 1994.

---

589

Jeffrey S. Alley, David R. Pierce, Scott, Hulse, Marshall, Feuille, Finger & Thurmond, El Paso, Larry W. Hicks, Jeffrey T. Lucky, Hicks & Associates, El Paso, for appellants.

Phillip C. Bowen, Johnson & Bowen, Brenda J. Norton, El Paso, for appellee.

Before KOEHLER, LARSEN and McCOLLUM, JJ.

## OPINION

LARSEN, Justice.

In this appeal, Texas Builders, Warner Communications, Inc., and Atari Holdings, Inc. challenge a judgment awarding James A. Keller Realtors, Inc. a commission on the lease of commercial property. After a bench trial, the court awarded judgment to Keller for $68,586, imposed a constructive trust on the property for 6% of all future lease payments or sales proceeds, and awarded exemplary damages of $100,000 jointly and severally against all defendants. All defendants appeal. We affirm in part and reverse and render in part.

## FACTS

In 1984, Texas Builders leased one of its commercial real estate properties located at 12058 Rojas, El Paso Texas, to Atari, Inc. Atari was a manufacturer of video games, and intended to use the property for that purpose. Texas Builders began substantial improvements to its building to accommodate Atari's needs. Before Atari ever occupied the building, however, it was acquired by Warner Communications, Inc. and ceased operations. The company's name was changed to Atari Holdings, Inc. and its sole purpose became the winding up of Atari's affairs.[1] Atari Holdings' officers and directors were all employees of Warner Communications, and it never had separate headquarters or independent employees or functions after it was acquired by Warner.

One of Atari Holdings' tasks was to extricate itself, on the best terms possible, from its obligations stemming from its lease with Texas Builders. To that end, in 1986 it entered an exclusive listing agreement with James A. Keller Realtors, a commercial real estate brokerage in El Paso. Keller was to look for a subtenant to take over the lease. Warner/Atari renewed this listing several times, with the last agreement expiring September 30, 1988. The agreement contemplated a 4% broker's commission if Keller found a suitable subtenant for Warner/Atari's

[1] We refer to Atari and Warner collectively throughout this opinion. Although alter-ego and related issues have been raised in this appeal, our disposition of the case does not turn on whether Atari and Warner acted independently or as a single entity.

space, at a rental of $4 per square foot for 112,500 square feet.

During this time Warner/Atari also negotiated directly with Texas Builders in an effort to buy out the remaining term of the lease. The contract provided for an early buy out after five years if Warner/Atari paid Texas Builders $700,000. Keller recognized that Warner/Atari had the right to buy out of the lease, which might affect its exclusive listing contract. Keller was aware of the on-going negotiations Warner/Atari had with Texas Builders to free itself from the obligation to rent unused space.

In addition, Texas Builders was attempting to find tenants for a number of its properties, including the empty Warner/Atari space. In January and May 1988, Texas Builders sent letters to El Paso brokers listing the properties it had available, including Warner/Atari's leased building. Both letters stated "Texas Builders pays 6% commission for all signed leases." Texas Builders sent one of these letters to Keller Realty.

Keller's evidence at trial sounded a theme of discontent with Texas Builders. Keller's agents had trouble showing the Warner/Atari property to prospective tenants. Among other difficulties, Texas Builders refused to give Keller a key to the property and would not allow Keller to put its sign on the building. Keller presented testimony that Texas Builders would discourage tenants from renting the Warner/Atari space by telling them it would take at least 6 months to complete the half-finished interior construction. Texas Builders would then describe to potential tenants other properties it owned that were unleased and could be available in far less time. Thus, Keller claimed, Texas Builders could continue receiving rent for the unused space from Warner/Atari, while encouraging rental of other idle properties. The implication of this evidence was that Texas Builders was, (from an early date) sabotaging Keller's efforts to sublease Warner/Atari's space.

Texas Builders presented evidence that it had become equally disenchanted with Keller during this time. Keller's agents had apparently made disparaging remarks to potential tenants about Texas Builders' construction; Keller had urged one such client to obtain an independent structural inspection before renting Texas Builders' property. Keller had obtained an unauthorized key to the Warner/Atari space, which caused Texas Builders to change all locks on the premises and charge the cost against an unrelated Keller commission. In January 1986, Keller wrote a letter to Warner/Atari, explaining difficulties in subletting the property and suggesting that Warner/Atari try to negotiate a lower rent. He suggested that Warner/Atari require Texas Builders to finish the interior of the building as required by the lease, a process which had been halted when Warner/Atari ceased manufacturing operations. Texas Builders somehow obtained a copy of this letter, which enraged the partners and was apparently the final straw leading to the severing of all business relationships between Texas Builders and Keller Realtors.

Meanwhile Quickie Manufacturing, a light industrial manufacturing business, expressed its interest in relocating to El Paso. It began looking into commercial properties with the help of Keller and another broker, Best Realty. Keller sent Quickie a brochure and video on seven El Paso properties, including Warner/Atari's Rojas location. Quickie's representative, Peter Vosbikian, came to El Paso in 1988 and was shown the Rojas property by both Best and Keller agents. He was introduced to Texas Builders' property manager, Wayne Windle, by Best.

Keller presented Warner/Atari with a proposal from Quickie, but Warner/Atari concluded Quickie was not a suitable subtenant and rejected its offer. Warner/Atari suggested that Keller go directly to Texas Builders with Quickie's proposal, as Warner/Atari did not intend to continue its lease past its five-year buy out option, did not want to pay for Quickie's proposed improvements to the property, and wanted a subtenant for the entire building, not just the 50,000 square feet in which Quickie was interested.

Matt Koch, a Keller agent, then went directly to Wayne Windle with Quickie's proposal. Windle at that time completed an internal "space inquiry sheet" that listed the

desired square footage, lease rate, and Matt Koch (a Keller agent) as broker. The sheet did not mention any commission.

It is here that the parties' versions of events diverge. Matt Koch testified that he called Wayne Windle repeatedly asking for Texas Builders' response to the Quickie offer. Windle told him each time that Gerald O'Brien, a Texas Builders' partner, had to make the decision, and that O'Brien was extremely ill. Windle claimed that he was under strict orders not to disturb O'Brien, and therefore was unable to give Koch an answer. Texas Builders' telephone logs and call records reflect otherwise, that Windle was communicating extensively with O'Brien, Quickie, and Warner/Atari during this time. On August 4, 1988, Koch learned for the first time that Texas Builders would not enter any lease for which Keller was the broker. Koch testified that only when he directly confronted Windle did he learn that Texas Builders was negotiating directly and indeed refused to do any further business with Keller.

Windle, on the other hand, testified that he was unable to reach O'Brien and could not get a response to Quickie's offer. He testified repeatedly that he could remember almost nothing about the events leading to this lawsuit. Quickie did enter into the lease with Texas Builders, and no commission was ever paid to Keller, despite Keller's written demands. Keller eventually brought suit against Texas Builders, Warner, and Atari, and obtained judgment for actual and punitive damages.

The record reflects that in El Paso commission agreements between brokers and landlords are never executed in commercial land transactions until a deal is complete. Thus, a broker is without any legal recourse against an owner who refuses to pay a commission, no matter how instrumental that broker was in obtaining a lease or sale. Texas Builders argues that this system works because "the practicalities of working in the relatively small El Paso industrial real estate market and the dependence of real estate owners on brokers prevents owners from abusing the system."

### TEXAS BUILDERS' APPEAL

Texas Builders, in twenty-eight points of error, claims that the trial court erred in entering judgment against it. Their complaints can be divided into six categories: lack of a written commission agreement, lack of evidence on fraud, lack of pleadings or evidence to support a constructive trust, lack of evidence on conspiracy, lack of evidence on tortious interference with contract, and the inappropriateness of exemplary damages. We examine these complaints in turn.

### A. Written contract for real estate commission.

In its Points of Error One through Ten, Texas Builders complains that the trial court erred in finding a breach of contract, as there was no evidence or insufficient evidence to establish that Keller possessed an enforceable promise to pay a commission. Texas Builders also urges in these points that Keller's evidence of contract failed as a matter of law. We disagree.

Real estate brokers in Texas are regulated by the Real Estate License Act, TEX.REV.CIV.STAT.ANN. art. 6573a *et seq.* The act applies to leases as well as the sale of real property. *Carmack v. Beltway Development Co.,* 701 S.W.2d 37, 39 (Tex.App.—Dallas 1985, no writ). Keller sues in his capacity as a licensed real estate broker, and therefore the provisions of the Act govern this suit. TEX.REV.CIV.STAT.ANN. art. 6573a, § 2(1), (2) (Vernon Supp.1994); *Moser Co. v. Awalt Industrial Properties, Inc.,* 584 S.W.2d 902, 906 (Tex.Civ.App.—Amarillo 1979, no writ).

The Real Estate License Act provides:

An action may not be brought in a court in this state for the recovery of a commission for the sale or purchase of real estate unless the promise or agreement on which the action is brought, or some memorandum thereof, is in writing and signed by the party to be charged or signed by a person lawfully authorized by him to sign it. TEX.REV.CIV.STAT.ANN. art. 6573a, § 20(b).

The writing supporting a traditional seller's brokerage agreement must meet four requirements. It must: (1) be signed by the

persons to be charged with the commission, or one authorized to act on their behalf; (2) contain a promise that a definite commission be paid or refer to a written commission schedule; (3) state the name of the broker to whom the commission is to be paid; and (4) identify with reasonable certainty the land to be conveyed. *LA & N Interests, Inc. v. Fish*, 864 S.W.2d 745, 749–50 (Tex.App.—Houston [14th Dist.] 1993, no writ); *Moser Co.*, 584 S.W.2d at 906. The writing need not be a formal contract or memorandum, but its essential elements must be apparent and may not be supplied by parol testimony. *O'Boyle v. DuBose–Killeen Properties, Inc.*, 430 S.W.2d 273, 277 (Tex.Civ.App.—Dallas 1968, writ ref'd n.r.e.). The requirements of the Real Estate License Act are identical to those of the statute of frauds, and strict compliance with the Act's terms are necessary to maintain a broker's action for recovery of a commission. *Brice v. Eastin*, 691 S.W.2d 54, 57 (Tex.App.—San Antonio 1985, no writ); *O'Boyle*, 430 S.W.2d at 277. Texas Builders, in its Points of Error One through Ten, claims that Keller cannot recover because no written agreement meeting these requirements was ever entered into by the parties.

The only documents Keller points to in rebutting this argument are not, in the conventional sense, contracts. Keller relies first upon the informational letters sent by Texas Builders to all local commercial brokers in January 1988 and again in May of that year. Those read, in relevant part:

Mr. Matt Koch
James A. Keller Realtors
Texas Commerce Bank Bldg.
El Paso, TX 79901

Dear Broker,

The following is a list of our buildings which have space available for immediate occupancy.

. . . . .

12050 Rojas 58,333 square feet

. . . . .

Please note that we have extremely competitive rates and the highest quality service. Texas Builders pays 6% commission for all signed leases.

Enclosed is information about our company and projects.

We look forward to doing business with you.

Sincerely,
·Wayne W. Windle

These letters name the property located at 12050 Rojas; they were signed by Wayne W. Windle, Texas Builders' property manager, a person authorized to act for Texas Builders; they state the commission percentage Texas Builders will pay; and name the Keller firm as the broker to receive the commission.[2]

Texas Builders argues that the letters are insufficient to meet the requirements of the Real Estate License Act for two reasons: (1) they do not sufficiently describe the property to be leased; and (2) they do not state whether the 6% commission is payable in a lump sum, whether it is 6% of collected rent, nor whether it includes any expansions, renewals, or sales following lease. Thus, Texas Builders claims, the letters do not establish essential elements to an agreement, and are too vague to enforce as contracts.

▆▆▆ First, we must determine whether the language "our building[ ] which ha[s] space available for immediate occupancy ... 12050 Rojas, 58,333 square feet" sufficiently describes the property to be conveyed. A writing sufficient to comply with the Real Estate License Act need not describe the property with the exactness necessary in deeds. *James v. Baron Industries, Inc.*, 605 S.W.2d 330, 332 (Tex.Civ.App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.). A street address standing alone might not be a reasonably certain description of real estate to

---

**2.** There are other documents upon which Keller seems to rely in arguing there was a written contract: "space inquiry sheets," documents used internally by Texas Builders and completed by Windle, as well as the lease ultimately entered between Quickie and Texas Builders. We do not think these documents can be read together with the solicitation letters to create a contract, as they were not in existence at the time the letters were written and the letters do not refer to them. Thus, our determination of whether Keller possessed an enforceable commission contract must focus upon the solicitation letters alone.

enforce a claim to a commission; it may become sufficient, however, if the broker presents extrinsic evidence explaining or clarifying the data contained in the writing. *Webb v. Eledge,* 678 S.W.2d 259, 262 (Tex. App.—Amarillo 1984, no writ); *Hereford v. Tilson,* 145 Tex. 600, 200 S.W.2d 985, 988–89 (1947). The extrinsic evidence may not be relied upon alone, however, to supply the essential element of the land's description. *Morrow v. Shotwell,* 477 S.W.2d 538, 541 (Tex.1972); *Wilson v. Fisher,* 144 Tex. 53, 188 S.W.2d 150, 152 (1945).

Courts have held sufficient descriptions as vague as "my 960 acres of land in Dallas County" where it was shown that the obligor owned only one such tract, *Ragsdale v. Mays,* 65 Tex. 255 (Tex.1885); "approximated 100 acres.... the same property conveyed to me by deed * * * recorded in Vol. 1605, page 477, Travis County Deed Records," even where the property was to be carved from the owner's full 145 acre tract and was not otherwise identified, *West v. Barnes,* 351 S.W.2d 615, 618 (Tex.1961); "Willowick Place patio homes and the five (5) townhomes on Nantucket," with a dateline of "City of Houston, Harris County, Texas," from which the court presumed that the property was located in Houston, *James,* 605 S.W.2d at 332; "the San Gabriel Apartments," with the dateline "San Antonio, Texas," *Krueger v. W.K. Ewing Co., Inc.,* 139 S.W.2d 836, 839 (Tex.Civ.App.—El Paso 1940, no writ); "my ranch of 2200 acres," where the obligor owned only one ranch, *Jones v. Smith,* 231 S.W.2d 1003, 1004 (Tex. Civ.App.—Austin 1950, writ ref'd n.r.e.); and "Old Wes Smith Ranch, in Kimble & Mason Counties," *Volkmann v. Wortham,* 189 S.W.2d 776, 777 (Tex.Civ.App.—San Antonio 1945, writ ref'd). In each of these cases, the court held the writing reasonably identified the land. The common-sense rule was well stated by this Court:

> [A] contract, we think, may also sufficiently describe property by its common or particular name by which it is known in the locality where situated.... 'The office of a description is not to identify the land, but to afford the means of identification, and when this is done, it is sufficient. Generally, therefore, any description is

sufficient by which the identity of the premises can be established, or which furnishes the means of identification.' *Krueger,* 139 S.W.2d at 839, quoting 18 *Corpus Juris* at 181.

The question here, then, is whether the identification within Texas Builders' solicitation letters sufficiently identified the Warner/Atari land. The letters refer to "12050 Rojas," while Warner/Atari's leasehold is generally referred to by all parties as "12058 Rojas." Plaintiff explained this discrepancy through Keller's testimony:

Q: [By Mr. Bowen] Mr. Keller, I'll refer you to P–10. What is P–10, please?

A: [By James Keller] That's a plat of two of the buildings that Texas Builders had available on Rojas Street.

Q: Does P–10 show the Atari space?

A: Yes, it does.

Q: How is it designated on P–10?

A: 12058 Rojas, 112,500 square feet.

Q: What does P–10 show and depict with respect to 12050 Rojas and 12058 Rojas?

A: That was one building they showed the address. Truesdell was at the west end of the building. They showed Tonka Toys in the middle section of the building and Warner Communications in the east end of the building.

Q: Is 12050 Rojas and 12058 Rojas the same building?

A: It's one building, just with different mail addresses.

Q: In fact, is there a 12054 Rojas?

A: 12054 is where Texas Builders' Offices were in the middle of the building there. It's not depicted on here but it's in that section that shows—I believe it's where that Tonka Toys shows on there. The offices were built up in front of the building.

Q: Mr. Keller, if the occupant that was in 12058 removes itself from the building, if the occupant removes itself from 12054, where does that leave you with

respect to an address which designates the entire building?

A: 12050.

This plat indicates that 12050 Rojas was 100,000 square feet, and 12058 Rojas 112,500 feet.

Neither of these measurements complies with the 58,333 square feet listed in the solicitation letters. The lease ultimately entered between Texas Builders and Quickie Manufacturing described the premises transferred as:

> [R]eal property situated in the County of El Paso, State of Texas, commonly known as 12058 Rojas Drive, City of El Paso, and described as 30,893 square feet of office warehouse space in the office warehouse building of 112,500 square feet *with an additional 16,667 square feet of warehouse space in the warehouse building of 100,000 square feet (commonly known as 12050 Rojas)*.... [Emphasis added].

Later, during cross-examination by Texas Builders' attorney, Keller testified:

Q: [By Mr. Pierce] "I'm asking if you had a written contract of any kind with Texas Builders for a six-percent commission on the Atari space for the Quickie Lease." And what was your answer?

A: My answer was, "no, not on the Atari space," and can I explain it?

. . . . .

A: That was before I knew they had leased space in 12050 of Texas Builders' building, which I did have an agreement with, and they leased part of the space in that building that was not under the Atari lease.

So they did take some space in the other deal, too, that I had the letter saying that they would pay me a six-percent commission on. At this time, I didn't know they took space next door.

Q: So you're telling us that they did lease space in 12050, right?

A: Yes.

Q: But they didn't lease—but you didn't have a contract for 12058, did you?

A: Correct, I only had that with Warner Communications/Atari.

And later:

Q: Isn't the west end where there is a big sign on the building that says 12050?

A: Where Truesdell is.

Q: Right. And the east end, there's a big sign that says 12058, isn't there?

A: After Warner—after Warner moved in, they put that in there. That address wasn't there until Warner moved in.

Q: So you're testifying that—

A: That was an address after they leased it.

Q: And you recall that specifically?

A: That's what I was told, that 12050 was that building.

Q: Okay. But you don't know that from personal knowledge?

A: That's what it was always called. When we discussed it with Texas Builders, it was called 12050 Building.

It's a—if you look at an aerial of it, it is one building. It's not two buildings. It is one single building that is cut into separate spaces. And when we have a multi-tenant building, normally every developer calls it the lowest number, 12050. And then as other people move in, they start adding addresses to it, and that's the normal way it's done.

Windle also testified that Quickie had rapidly expanded its leasehold to 131,000 square feet by November 1989. We conclude that Texas Builders' written solicitation letters of January and May 1988, together with the clarifying evidence cited above, identified the land conveyed with certainty sufficient to satisfy the Real Estate License Act.

█ Regarding Texas Builders' contention that the 6% commission mentioned in its solicitation letters is too vague to enforce, we believe the same rule of construction applicable to identifying the land applies. If the commission amount is stated with sufficient particularity that it may be clarified, without contradicting its terms, through other evidence, then we believe the trial court was within its discretion in enforcing it. Here, Keller introduced three leases it had negotiated for Texas Builders in other transactions; all called for 6% commission from monthly rents as collected. There is evidence this was an established course of dealing between the parties. James Keller calculated the amount that would be due Keller under the Texas Builders–Quickie lease as $180,000, which is substantially more than the trial court awarded in actual damages. We find the agreement to pay a 6% commission was sufficiently specific to be enforceable.

We therefore conclude there was a writing sufficient to comply with the Real Estate License Act, and that Keller was entitled to enforce its claim to a 6% commission on the Quickie lease. Texas Builders' Points of Error One through Ten are overruled.

**B. Fraud.**

In its Points of Error Twelve through Twenty-two, Texas Builders claims that the trial court's entry of judgment against it based upon fraud, and various findings of fact supporting the fraud judgment, are not supported by the law or evidence. First, Texas Builders argues that where a plaintiff is barred recovery for failure to comply with the writing requirement of the Real Estate License Act, that broker cannot circumvent the Act's requirements by raising extra-contractual tort claims. *Cissne v. Robertson,* 782 S.W.2d 912, 921 (Tex.App.—Dallas 1989, writ denied). While we agree with this proposition of law as a general matter, it has no application here as we have affirmed Keller's judgment for breach of contract. We therefore reject that portion of Texas Builders' argument, and examine the record to see if evidence supports a finding of fraud.

█ The elements of fraud are: (1) a material representation; (2) that was false; (3) that the speaker knew to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) made with the intent that it be acted upon by the other party; (5) that the other party did act upon; and (6) to the other party's detriment. *State National Bank of El Paso v. Farah Mfg. Co.,* 678 S.W.2d 661, 681 (Tex.App.—El Paso 1984, writ dism'd agr.). Denial that a promise was made is a factor in showing no intent to perform, and failure to perform a promise to act in the future, together with slight circumstantial evidence of fraud, is sufficient to support a finding of fraudulent intent. *T.O. Stanley Boot Co., Inc. v. Bank of El Paso,* 847 S.W.2d 218, 222 (Tex.1992); *Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 435 (Tex.1986); *Schindler v. Austwell Farmers Cooperative,* 829 S.W.2d 283, 286 (Tex. App.—Corpus Christi), *aff'd as modified,* 841 S.W.2d 853 (Tex.1992). Texas Builders' Points of Error Twelve through Sixteen claim, respectively, that there was no evidence or insufficient evidence for the trial court to find that Wayne Windle was negotiating a lease with Quickie at the same time he was unable to respond to Keller; that Wayne Windle deliberately or intentionally misrepresented why Texas Builders did not

respond to the Quickie offer; that Texas Builders intentionally deceived Keller about its intentions to deal with the broker; that Keller could have induced Quickie to lease other property had it known Texas Builders intended not to deal with it; and that Keller was injured by any act of Texas Builders.

The evidence in this case established the following: Keller employees were introduced to Peter Vosbikian, an officer of Quickie Manufacturing, by the El Paso Business Association. Quickie was interested in relocating to El Paso, and Matthew Koch, a Keller realtor, showed Quickie seven or eight properties available in El Paso, including one owned by James Keller's brother. Quickie was interested in several of the properties. Keller took a Quickie offer to Warner/Atari, with whom it had a written listing agreement, but Warner/Atari rejected the Quickie proposal. Keller then went to Texas Builders directly, and presented Quickie's offer to Wayne Windle. Koch tried repeatedly to get a response to that offer from Windle; Windle put him off for weeks by saying that Jerry O'Brien, one of the Texas Builders partners who must approve any lease, was very ill and unavailable. Texas Builders' telephone records for this period showed the contrary, that Windle had been in frequent contact with Jerry O'Brien and Vosbikian between July 26th and August 4th, during exactly the time he was telling Koch he could not respond to Quickies' offer because of O'Brien's illness. Windle also made calls to Warner/Atari during this time, and negotiated a satisfactory arrangement between Quickie, Texas Builders, and Warner/Atari for the lease of space located at 12050–12058 Rojas. An agreement between the three, unbeknownst to Keller, was consummated on August 4, 1988. On that date, Keller called Quickie to apologize for the delay in obtaining a response on the Warner/Atari space; in this conversation Keller learned for the first time that Windle had been negotiating with Quickie directly, and had told Quickie Texas Builders would not deal with Keller at all. Texas Builders did not inform Keller of its refusal to deal through them until August 10. From all this, we hold that the trial court reasonably concluded that Texas Builders falsely led Keller to believe it would negoti-

ate the Quickie lease through Koch, while intending instead to cut Keller out of the deal by negotiating directly with Quickie. We also hold that the trial court reasonably concluded Keller could have steered Quickie to other available properties, had it known of Texas Builders' intentions. This is evidence of two things: Texas Builders had a motive to string Keller along, and that Keller was harmed by Texas Builders' deception. Texas Builders' Points of Error Twelve through Twenty-two are overruled.

## C. Exemplary damages against Texas Builders.

In Texas Builders' Point of Error Eleven, it claims that the trial court erred in entering an exemplary damage award against it. This challenge is based upon lack of findings by the trial court, lack of evidence to support exemplary damages, and lack of actual damages which must precede an exemplary damage award. As we sustain the trial court's finding of fraud against Texas Builders, the third challenge fails. We now examine Texas Builders' remaining contentions.

We have detailed the evidence supporting a finding of fraud in the preceding section, and we believe that same evidence supports the trial court's assessment of exemplary damages under a no evidence review. It is well settled that upon a finding that defendant committed fraud, exemplary damages may be assessed. See TEX.CIV. PRAC. & REM.CODE ANN. § 41.003 (Vernon Supp.1994); *Spoljaric,* 708 S.W.2d at 436; *Trenholm v. Ratcliff,* 646 S.W.2d 927, 933 (Tex.1983); *Horton v. Robinson,* 776 S.W.2d 260, 265 (Tex.App.—El Paso 1989, no writ). We therefore conclude that the trial court's findings support the award against Texas Builders for exemplary damages, and that the evidence in support of such finding is adequate to survive a no evidence review.

In deciding whether sufficient evidence supports the trial court's award of exemplary damages, we are governed by the Texas Supreme Court's recent decision in *Transportation Insurance Co. v. Moriel,* 879 S.W.2d 10, 26 (Tex.1994). Although Texas Builders has couched its point of error in terms of "no

evidence" to support exemplary damages, out of an abundance of caution we will analyze the record under both no evidence and insufficient evidence standards. In *Moriel,* the Supreme Court held that we must detail relevant evidence in our opinion and explain why that evidence supports or does not support the punitive damage award in light of the requirements of *Alamo National Bank v. Kraus,* 616 S.W.2d 908 (Tex.1981). *Kraus* sets out the following five factors:

(1) the nature of the wrong;

(2) the character of the conduct involved;

(3) the degree of culpability of the wrongdoer;

(4) the situation and sensibilities of the parties concerned;

(5) The extent to which such conduct offends a public sense of justice and propriety. *Id.* at 910.

We will therefore examine the evidence adduced by Keller in support of exemplary damages in light of these criteria.

 The "nature of the wrong" here is fraudulent conduct; the trial court found that Texas Builders had induced Keller to obtain a potential leasee for its building by promising a six percent commission, but upon Keller's presentation of a suitable tenant, cut Keller from the deal. The "character of the conduct" particularly favors imposition of exemplary damages here; the evidence found credible by the trial court established that Texas Builders, after soliciting the help of Keller (among other local brokers) in renting its space, deliberately misled Keller for weeks, telling Keller's agents that it could not make a decision because the responsible partner was deathly ill, and meanwhile actively pursuing the lease behind Keller's back. The "degree of culpability of the wrongdoer" likewise clearly supports imposition of exemplary damages; Texas Builders did not innocently or mistakenly enter into a transaction that had the effect of depriving Keller of its commission. Instead, it made a decision that, rather than do one last deal with Keller and then cease its business relationship, it would mislead Keller into believing it was still part of the lease transaction until it was too late to take Quickie to other potential manufacturing sites. The "situa-

tion and sensibilities of the parties," in contrast, does not weigh strongly in favor of exemplary damages; these were independent professional entities, performing arms-length business transactions, mutually unhappy with the other's behavior. The final *Kraus* factor is "the extent to which such conduct offends a public sense of justice and propriety." We find that this factor clearly weighs in favor of exemplary damages here. Texas Builders engaged in a course of business conduct in which it knew the broker could not enforce a commission agreement unless it was written, believed there was no such enforceable writing (a viewpoint it vigorously argues even now), and therefore felt free to deliberately mislead the broker to its advantage and the broker's detriment. This is conduct which would lead the business world into chaos if left unchecked. The public sense of justice and propriety are certainly offended by this sort of deceptive enterprise.

We therefore conclude that the pleadings, findings and evidence support the trial court's imposition of exemplary damages here under plaintiff's fraud theory of recovery. Texas Builder's Point of Error Eleven is overruled.

### D. Constructive fraud and constructive trust.

Texas Builders' Points of Error Twenty-three and Twenty-four complain that the trial court wrongly imposed a constructive trust upon the proceeds of the lease between Texas Builders and Quickie. First, Texas Builders argues, Keller filed no pleadings supporting such a remedy; second it claims there was no evidence of any special relationship between it and Keller, such that a finding of constructive fraud, supporting the constructive trust, is without basis in the evidence. We agree that no evidence of a special relationship between these parties exists here, and that a constructive trust should not have been imposed.

 Constructive fraud is the breach of a legal or equitable duty that the law condemns as fraudulent merely because it tends to deceive others, violate confidences, or cause injury to public interest. In con-

structive fraud, the actor's intent is irrelevant. *Archer v. Griffith,* 390 S.W.2d 735, 740 (Tex.1964); *Chien v. Chen,* 759 S.W.2d 484, 494 (Tex.App.—Austin 1988, no writ). Constructive fraud can only occur upon the breach of a legal or equitable duty. *Gillum v. Republic Health Corp.,* 778 S.W.2d 558, 571 (Tex.App.—Dallas 1989, no writ). Constructive fraud can only arise where a fiduciary duty exists between the parties, apart from the transaction that is the basis of the suit. *Consolidated Gas & Equipment Co. of America v. Thompson,* 405 S.W.2d 333, 336 (Tex.1966); *Patton v. Callaway,* 522 S.W.2d 252, 255–56 (Tex.Civ.App.—El Paso 1975, writ ref'd n.r.e.). That one party trusts another will not, standing alone, create a fiduciary relationship. *Chien,* 759 S.W.2d at 494 n. 6. The pleadings upon which Keller went to trial, its fifth amended petition and first and second supplemental petitions, contain no prayer for imposition of a constructive trust. The factual allegations upon which such a remedy must be based do assert that a special relationship arose between Keller and Texas Builders, based upon Keller's presentation of Quickie Manufacturing as a prospective tenant, coupled with:

1. Solicitations for help and assistance in procuring tenants for their property;

2. Procurement of prospective tenants by KELLER to TEXAS BUILDERS; and

3. Payment by TEXAS BUILDERS of a standard 6% commission of all rentals paid by any tenant submitted by KELLER to TEXAS BUILDERS for which an actual lease was entered into.

Keller alleged that these facts created a duty of good faith and fair dealing between the parties. We disagree. These factual allegations do not describe a fiduciary duty; they describe regular business dealings. Likewise, nothing introduced at trial would support a finding that Keller and Texas Builders had a special relationship that would create a duty of good faith and fair dealing. The evidence proved only that the two had an arms-length business relationship. That Texas Builders committed constructive fraud finds no support in the evidence.

■ Further, Texas Builders challenges that portion of the trial court's judgment imposing a constructive trust or equitable lien on future rentals, extensions, modifications, or sales of the Warner/Atari space. We find the constructive trust fails for two reasons. First, nothing in Keller's pleadings requests that the trial court impose such a remedy. Second, imposition of a constructive trust requires a special relationship, which we have held did not exist in this case. *Consolidated Gas & Equipment Co. v. Thompson,* 405 S.W.2d 333, 336 (1966); *Patton,* 522 S.W.2d at 255–56. Texas Builders' Points of Error Twenty-three and Twenty-four are sustained.

### E. Tortious interference with contract.

In its Points of Error Twenty-six and Twenty-seven, Texas Builders claims that the trial court's judgment cannot be sustained on Keller's theory of tortious interference with contract. We agree with these contentions also.

■ The elements of tortious interference with contract are: (1) a contract subject to interference; (2) with which the defendant willfully and intentionally interferes; (3) without justification or excuse; and (4) proximately causes injury to plaintiff. *Sakowitz, Inc. v. Steck,* 669 S.W.2d 105, 108 (Tex.1984). Neither the trial court's findings nor the evidence support this theory of recovery. Keller's own evidence established that it submitted Quickie Manufacturing to Warner/Atari as a potential subtenant before Keller ever approached Texas Builders. Warner/Atari rejected the Quickie offer for several reasons. It was only after Warner/Atari declined Quickie's offer that Keller took the proposed deal to Texas Builders. This evidence is without contradiction in the record. Thus, Warner/Atari rejected Quickie independent of any action by Texas Builders. The listing agreement Keller had with Warner/Atari certainly allowed for the rejection of potential subtenants who were not satisfactory to Warner/Atari. Thus, no act by Texas Builders infringed upon Keller's listing agreement. Points of Error Twenty-six and Twenty-seven are sustained.

### F. Civil conspiracy between Warner/Atari and Texas Builders.

Texas Builders' Point of Error Twenty-five urges that the trial court's conspiracy finding cannot stand, as it is based upon a theory that Warner/Atari "knowingly benefitted from the fraudulent conduct of Texas Builders."[3] We agree.

■ A civil conspiracy requires a "combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983); *Perryco, Inc. v. FDIC*, 777 S.W.2d 549, 553 (Tex.App.—El Paso 1989, no writ). Although the trial court found, and we agree, that Texas Builders acted fraudulently towards Keller, there is nothing in the record to indicate that it joined with Warner/Atari to accomplish an unlawful purpose, or used unlawful means to accomplish a lawful one. Texas Builders' Point of Error Twenty-five is sustained.

### G. Exemplary damages against Warner/Atari and Texas Builders.

■ Texas Builders urges in its Point of Error Twenty-eight that the trial court erred in assessing exemplary damages jointly and severally against Texas Builders, Warner, and Atari. In support, Texas Builders cites TEX.CIV.PRAC. & REM.CODE ANN. § 41.005 (Vernon Supp.1994), which reads:

In any action in which there are two or more defendants, an award of exemplary damages must be specific as to a defendant, and each defendant is liable only for the amount of the award made against that defendant.

That provision does not directly control this case, as plaintiff's petition was filed before the statute's effective date. It does, however, reflect an underlying philosophy for imposing exemplary damages, which is that exemplary damages are imposed to punish wrongdoers, and therefore a joint and several imposition of these damages is usually inappropriate because a party not morally culpable may nevertheless be held legally responsible for a judgment. Where defendants are closely related, however, or where there are findings that defendants conspired to violate plaintiff's rights, then joint and several assessments of punitive damages have been upheld. Conversely, where the trial court's judgment contains individual assessments of exemplary damages, these have also been upheld. See *Transfer Products, Inc. v. Texpar Energy, Inc.*, 788 S.W.2d 713, 717 (Tex.App.—Corpus Christi 1990, no writ); *Bass v. Metzger*, 569 S.W.2d 917, 926 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.); *Curry v. Girard*, 502 S.W.2d 933, 935 (Tex.Civ.App.—Fort Worth 1973, no writ). We conclude that, prior to tort reform, where evidence established a link between the defendants or their wrongful actions, the trial court's decision to make an award of exemplary damages joint and several was within its sound discretion.

Here, we conclude that although there was evidence to support the trial court's determination that Texas Builders breached its contract and acted fraudulently toward Keller, there was no evidence to sustain findings of any breach or tortious conduct by Warner/Atari. Nevertheless Texas Builders, as the wrongdoer, can show no harm in the joint and several assessment of exemplary damages, as it is liable for the award in any event. Its Point of Error Twenty-eight is overruled. TEX.R.APP.P. 81.

### ATARI AND WARNER COMMUNICATIONS' APPEAL

Warner Communications and Atari Holding bring fourteen points of error in which they claim judgment was wrongfully entered against them. Their points can be divided into six categories: lack of pleadings, evidence or law to support the judgment for conspiracy, lack of pleading or evidence to support judgment for fraud, error in the trial court's refusal to find that Warner/Atari had established its defense of privilege as a matter of law, lack of evidence to support judg-

3. This point of error is urged by Warner/Atari, as well. The reasoning we apply here is applicable to Warner/Atari's claim, but because of our dis-position of their appeal, we reach the issue only here.

ment for breach of contract, the inappropriateness of the award of exemplary damages, and error in disregarding the corporate distinctions between Warner and Atari Holding. As we find it is dispositive of their appeal, we examine first their exemplary damage claim.

### EXEMPLARY DAMAGES

 The trial court awarded Keller actual damages of $68,586 against the Texas Builders defendants only; the trial court also awarded Keller $100,000 in exemplary damages. Although it assessed no actual damages against Warner or Atari, its judgment recites the following:

> The Court finds that Defendant WARNER COMMUNICATIONS, INC. and ATARI HOLDINGS, INC., conspired with representatives of TEXAS BUILDERS by knowingly benefitting from the fraudulent conduct of TEXAS BUILDERS' representatives and as a consequence thereof, WARNER COMMUNICATIONS and ATARI HOLDINGS, INC. shall be jointly and severally liable with Defendants, TEXAS BUILDERS, MARK O'BRIEN, Individually and as representative of the Estate of GERALD O'BRIEN, TIM O'BRIEN and MARVIN OATES for $100,000.00 as exemplary damages.

In their Point of Error Six, Atari and Warner urge, among other things, that absent an award of actual damages against them, the joint and several award of exemplary damages cannot stand. We agree. Under Texas law, exemplary damages are not recoverable absent an award of actual damages. *Nabours v. Longview Savings and Loan Association,* 700 S.W.2d 901, 904 (Tex.1985); *Doubleday & Co., Inc. v. Rogers,* 674 S.W.2d 751, 753–54 (Tex.1984). No judgment for actual damages having been imposed upon Warner and Atari, the judgment of joint and several liability for exemplary damages was error. Warner and Atari's Point of Error Six is sustained.

As the only liability imposed upon these defendants was for exemplary damages, we do not address their remaining points of error.

### CONCLUSION

We sustain the trial court's judgment for actual and exemplary damages against Texas Builders for the reasons set forth in our opinion. We reverse and render that portion of the trial court's judgment ordering a constructive trust be imposed upon payments to Texas Builders for the leasehold at issue here. We further reverse and render the trial court's judgment awarding Keller exemplary damages against Warner/Atari, as it awarded no actual damages against those entities.