NUMBER
13-97-116-CV

 

                             COURT OF APPEALS

 

                   THIRTEENTH DISTRICT OF TEXAS

 

                                CORPUS CHRISTI

____________________________________________________________________

 

BRUCE BRADFORD, ET. AL.,                                                Appellants,

 

                                                   v.

 

ROELL VENTO, ET. AL.,                                                      Appellees.

____________________________________________________________________

 

                        On appeal
from the 357th District Court

                                 of Cameron County, Texas.

____________________________________________________________________

 

                                   O
P I N I O N

 

                                  Before the Court En Banc

Justice Yañez delivered the opinion of the Court, in which Justices
Hinojosa and Rodriguez joined.

 








Appellants
Bruce Bradford, Simon Property Group (ASimon@), and Golden Ring Mall Company (AGolden@) challenge the legal and factual sufficiency of the evidence in
support of a jury verdict in favor of appellees Roell and Debra Vento (Athe Ventos@).  The jury found (1) Tom
Taylor, Bradford, Simon, and Golden liable for civil conspiracy and fraud;
(2)  Bradford and Taylor liable for
tortious interference with prospective contractual relations, intentional
infliction of emotional distress, and violations of the Deceptive Trade
Practices Act (DTPA);  and (3) Taylor
liable for breach of fiduciary duty and breach of contract for sale of the
business.  The judgment awarded appellees








 $1,274,000[1] in actual damages and $6,500,000[2] in exemplary damages.  Taylor did not appeal.  








Appellants
also challenge the legal and factual sufficiency of the evidence supporting the
damages awarded for lost profits, conversion of property, mental anguish, and
exemplary damages.  Appellants also argue
that appellees waived their right to recover on their claim for tortious
interference with prospective business relations, and that the judgment
improperly permitted appellees to stack damages elements from different
theories of recovery rather than requiring them to elect one theory of
recovery.  Appellees argue one cross
point, that the trial court should have awarded damages based on the DTPA.  We affirm in part and reverse in part,
rendering judgment that the appellants are jointly and severally liable to the
appellees for $864,000 in actual damages and $4,520,000 in exemplary damages.

                                                              I.

Facts

Taylor owned a business in Valle Vista Mall in Harlingen, Texas, selling sports cards and other sports memorabilia.  Bradford was the manager of the mall, and Simon Property Group and Golden Ring
Mall were the owners of the mall.  Vento[3] was a collector of sports memorabilia who became involved with Taylor and the store at Valle Vista Mall.








Vento began
collecting sports cards when he was eleven years old.  His interest in sports cards and other sports
memorabilia grew as he became older, until, as a young man living in the
Dallas-Fort Worth area, he devoted much of his free time to going to shops and
trade shows to enhance his collection. 
At this time he decided that he wanted to open a store of his own
selling sports collectibles.  He and his
wife frequently traveled to the Rio Grande Valley to visit family, and Vento would finance these trips by selling items
he had collected to collectors in the Valley. 
In this way he became very familiar with the market for sports
collectibles in the Valley.  

While Vento
was living in Fort Worth he often traded with Taylor and left items on consignment for sale in Taylor=s store.  Vento=s consignment stock at Taylor=s store grew to the point where sixty per cent of the stock in Taylor=s store actually came from Vento. 
Vento testified that in May or June of 1994 he and Taylor agreed to be
partners in the business.  Taylor soon began expressing an interest in getting out of the business
altogether, and the two discussed Vento purchasing outright ownership.  In August Taylor went on a trip to Seattle and left Vento in charge.  

At this
point the stories of the parties begin to diverge significantly.  Taylor testified that when he returned from Seattle the store was Aa mess@ and some expensive items were missing.  Taylor also testified that Vento had mismanaged the financial accounts of
the business and failed to order new stock. 
He considered having a Afire sale@ to put the store back on firm financial ground, and estimated that it
would take five to seven thousand dollars to Aget all of this taken care of and everything back to normal so that
[the store] can operate properly and function through the Christmas season when
[he] was going to be selling the store.@  Vento agreed that he would try
to get the money, and soon after brought Taylor a check for $7000.  Taylor used this money to order stock and buy a computer and security system
for the business.  








Vento
testified that the $7000 check was payment for Taylor=s half of the business, and produced a contract, dated September
 15, 1994 and signed by both parties, describing a sale of Taylor=s interest to Vento effective upon payment of $7000.  Taylor testified that he never agreed to a sale for $7000, and that his
signature on the contract was forged. 
Over the next couple weeks Taylor continued to go to the store and wait on customers, which Aseemed pretty odd@ to Vento.  Vento initially
decided that Taylor may have come to the store to Ashoot the breeze and hang out or whatever.@  

On October 4,
 1994, Vento went to the mall office with a cashier=s check for $770 to pay the store=s rent for October, and asked to speak with Bradford.  Vento and Bradford testified
to different accounts of their conversation. 
According to Vento, he told Bradford that he had bought the store outright and now owned all of it, and
showed Bradford the sale contract.  Bradford congratulated Vento, and mentioned that he had already known that
Vento and Taylor were discussing a sale of the store from previous
conversations Bradford had with Taylor.  Vento expressed an interest
in a long term lease.  Bradford consulted some files, and then told Vento that the space the store
occupied Ashould@ rent for $2700, and that Taylor had been getting Aa decent deal at $770.@  Bradford also said that a long-term lease was a bad idea because sports card
stores generally do not do well in malls. 
Vento asked Bradford what would be the longest lease he could get, and Bradford replied Amaybe the longest we can do is a three-month or a six-month.@  Vento wanted to sign a lease
at that point, but Bradford told him Anot to worry@ with it that month, to come back in January and he would Atake care of@ him.








Bradford testified that Vento told him he was Ain the process@ of buying the store from Taylor, not that he had completed the purchase.  Bradford told Vento that Taylor had negotiated a lease that lasted through November and December, and
that the lease was non-assignable.  Bradford testified that he understood Vento to be Taylor=s employee, and was never aware that Vento had actually acquired any
ownership interest in the store.  Vento,
however, testified that Bradford knew Vento had been Taylor=s partner.  

Later on
October 4, Vento finally confronted Taylor about his continued presence at the store, and the two argued about
who owned the business.  According to
Vento, Taylor told him the business was worth a lot more than $7000, and that the
$7000 should be just a down payment. 
Vento insisted that the two had executed a binding contract and the sale
was completed.  Vento testified that he
called the police, but Taylor left before the police arrived. 
Taylor testified that he did not know Vento had called the police, and that
he had left to go home and gather some papers to try to prove his
ownership.  








Taylor testified that he went to speak with Bradford on October 5 or 6 to
tell him about the disagreement he had with Vento.[4]  Bradford testified that Taylor approached him the morning of October 6 and briefly told him there
might be a confrontation between him and Vento, but did not explain himself any
further.  Taylor testified that he told Bradford Awhat was going on@ in Aa roundabout way.@  After his conversation with Taylor, Bradford directed the mall=s security guard to remain near the store.








That morning
Taylor and Vento did have another confrontation.  Taylor testified that he and his wife went to the store before it opened,
and, upon discovering that his key no longer worked in the store=s locks, waited for Vento.  Taylor testified that when Vento arrived he walked over to confront him, and
Taylor=s wife went to call the police.[5]  The mall=s security guard, who was nearby as he had been instructed to be, also
entered the store.  Bradford also appeared on the scene shortly thereafter.  Bradford explained in his testimony that he was nearby not for the purpose of
intervening in any confrontation that may arise, but rather because he was
checking on remodeling work being done at a neighboring store.  

When the
police arrived, they turned to Bradford for guidance in sorting out the argument between Taylor and
Vento.  According to Bradford, the police asked him whose name was on the lease, and he informed
them that Taylor=s name was on the lease. 
According to Vento, Bradford told the police Athe store belongs to Tom.@  According to one of the police
officers present, Jose Angel Villarreal, Bradford told him that Taylor owned the shop, and that Bradford did not want Vento inside the mall since he was causing a scene.  Officer Villarreal testified that the mall
security guard also told him that Taylor was the owner.  Another police
officer, Charles Manning, testified that Bradford did not exactly state that Taylor was the owner, but rather that Taylor was the one with a lease agreement. 
Officer Manning testified that Bradford told him he wanted to file criminal trespass charges against
Vento.  Based on Bradford=s statements and the fact that Vento had no papers to substantiate his
claim of ownership, the police told him to leave.  Officer Manning testified that Vento said he
wanted to retrieve some papers from his home and come back to prove his
ownership, but Manning advised him that if he came back, Bradford would charge
him with criminal trespass and he would be arrested.  Bradford testified that Taylor had asked the police to remove Vento from the store, and that he told
the police AMr. Vento hasn=t done anything wrong in the mall.@  Bradford also testified that he never threatened to charge Vento with criminal
trespass.








 On October 17,
 1994 Bradford and Taylor entered into a two-month lease to cover November
and December.  On November
 23, 1994, Vento obtained an injunction restoring him as owner of the
business.  Vento testified that the value
of the merchandise on hand in the store was $35,000 - $40,000 less on November
23, when the business was given back to him, than it had been on October 6,
when he was ejected.  Vento paid $770 in
rent for December, but was informed by the mall office that he still owed
$1430, because the rent rose in December to $2200.  On January 15,
 1995 the mall locked Vento out of the store, charging that he owed
$4168.66 in back rent and unpaid electricity bills.  Eventually Vento made prospective
arrangements for Louis Martin to pay the business=s outstanding debts and buy the business from him. 








However,
before the deal with Martin could be consummated, Martin wanted to see the
inventory of the business.  Vento
testified that he was told that the only way he and Martin could have a key to
see the store was if he would sign a statement releasing the mall from all
liability.  Vento refused to sign such a
release, and he and Martin left.  Bradford testified that, although he was not in the office when Vento and
Martin appeared, his employees phoned him to advise him of the situation and
seek his instructions.  According to
Bradford, Vento was not asked to sign a release, but rather a Areceipt@ specifying that the money received from Martin would be to satisfy
Vento=s debts and not for any other purpose, such as rent on a new
lease.  Bradford testified that his employees told him that Martin left because he
considered the situation too confusing. 
One week later, Vento was allowed to remove his merchandise without a
release.  Vento testified that when he
entered the store, it was in Atotal disarray@ and not at all as he had left it. 
He estimated that approximately $500 in merchandise was missing.  

Vento also
attempted to demonstrate a close relationship between Bradford and Taylor.  He testified that Taylor sold Christmas trees on the mall parking lot.  There was testimony from Bradford and Joyce
Plohocky, another mall administrator, that the $770 rent Taylor was paying was far below standard rates.  Vento also testified that he told Bradford
that Taylor was under-reporting the monthly sales of the business to the mall
as a means of lessening the portion he was required to pay to the mall, but
Bradford was unconcerned.

                                                             II.  

Evidentiary
Sufficiency Standards








We will
begin with the appellants= challenges to the findings in appellees= favor on their various theories of liability.  In reviewing a legal sufficiency challenge,
we consider all the evidence in the light most favorable to the prevailing
party, indulging every reasonable inference in that party=s favor.  Associated Indem.
Corp. v. Cat Contracting, 964 S.W.2d 276, 286 (Tex. 1998).  Anything more than a
scintilla of evidence is sufficient to support the finding.  Formosa Plastics Corp. USA v. Presidio Eng=rs and Contractors, Inc., 960 S.W.2d 41, 48 (Tex. 1998).  When confronting a
factual insufficiency challenge, we overturn findings only if they are so
against the great weight and preponderance of the evidence as to be clearly
wrong and unjust.  Ortiz v. Jones,
917 S.W.2d 770, 772 (Tex. 1996). 

Most of the
evidence in this case came in the form of testimony from interested
witnesses.  Testimony by an interested
witness may establish a fact as a matter of law only if the testimony could be
readily contradicted if untrue, and is clear, direct, positive, and there are
no circumstances tending to impeach or discredit it.  Lofton v. Texas Brine Corp., 777
S.W.2d 384, 386 (Tex. 1989).  If there is nothing to
cast suspicion on the testimony, that is, if reasonable minds could not differ,
then the jury must accept the testimony. 
William Powers, Jr. & Jack Ratliff, Another Look at ANo Evidence@ and AInsufficient Evidence@, 69 Tex. L. Rev. 515,
524 (1991).  But, if the testimony is
impeached, inconsistent, or otherwise suspect (even though not directly controverted),
that is, if reasonable minds might or might not accept it, then the jury may
reject it.  Id.  The jury is free to reject an
interested witness=s uncorroborated testimony based on its observation of the witness=s demeanor, attitude, and similar factors incapable of reproduction in
a written record.  Silva v. Enz,
853 S.W.2d 815, 818 (Tex. App.--Corpus Christi 1993, writ denied).  In this case, the testimony of the various
interested witnesses differs sharply and is in many instances directly contradictory,
leaving the jury with no choice but to make decisions regarding which witnesses
to believe and which not to believe.

 

 








                                                             III.

Fraud

We first
consider appellants= challenges to the jury finding on fraud.  The jury charge, taken from the Texas Pattern
Jury Charges, instructed the jury:

 Fraud occurs when----

 

a. 
A party makes a material misrepresentation,

 

b.   The misrepresentation is made with knowledge
of its falsity or made recklessly without any knowledge of the truth and as a
positive assertion,

 

c.
The misrepresentation is made with the intention that it should be acted on by
the other party, and 

 

d.  The other party acts in reliance on the
misrepresentation and thereby suffers injury.

 

This instruction informed the jury of the
elements of common law fraud, which are: (1) a material misrepresentation, (2)
the defendant knew the statement was false or made the statement recklessly
without any knowledge of its truth, (3) the defendant intended the plaintiff to
rely upon the statement, (4) the plaintiff relied upon the statement (5) to his
detriment.  Stone v. Lawyers Title
Ins. Corp., 554 S.W.2d 183, 185 (Tex. 1977); Harrison v. Bass Enters. Prod. Co., 888 S.W.2d 532, 536 (Tex. App.-‑Corpus Christi 1994, no writ).


The jury was
also instructed:

Fraud
may also occur when----

 

a.  A party conceals or fails to disclose a
material fact within the knowledge of that party,

 








b.  The party knows that the other party is
ignorant of the fact and does not have an equal opportunity to discover the
truth,

 

c.  The party intends to induce the other party
to take some action by concealing or failing to disclose the fact, and

 

d.  The other party suffers injury as a result of
acting without knowledge of the undisclosed fact. 

 

This instruction informed the jury of the
elements of Afraudulent concealment,@ also known as Afraudulent nondisclosure.@  Appellants did not challenge
the instruction or its submission to the jury at trial, and do not challenge it
in this appeal.

For there to
be actionable nondislosure fraud, there must be a duty to disclose.  Hoggett v. Brown, 971 S.W.2d 472,
487-88 (Tex. App.CHouston [14th Dist.] 1997, no writ). 
Whether such a duty exists is "entirely a question of law." Id.;
Ralston Purina Co. v. McKendrick, 850 S.W.2d 629, 633 (Tex.App.‑‑San
Antonio 1993, writ denied).  A duty to
disclose may arise in four situations: 
(1) when there is a fiduciary relationship;  (2) when one voluntarily discloses
information, the whole truth must be disclosed; 
(3) when one makes a representation, new information must be disclosed
when that new information makes the earlier representation misleading or
untrue;  and (4) when one makes a partial
disclosure and conveys a false impression. 
Hoggett, 971 S.W.2d at 487 (citing Formosa Plastics Corp. v.
Presidio Engineers and Contractors, Inc., 941 S.W.2d 138, 146‑47
(Tex.App.‑‑Corpus Christi, 1995), rev'd on other grounds,
960 S.W.2d 41 (1997); Ralston Purina, 850 S.W.2d at 635‑36).








Appellees
point to two incidents of fraud, both arising from a meeting between Vento and
Bradford at the mall office on October 4, 1994: (1) Bradford=s misrepresentation that Vento could continue operating the store
under the existing lease for $770 per month, and (2) Bradford=s failure to disclose certain requirements Vento would be required to
meet prior to his acceptance as a tenant. 


Vento
testified that during the October 4 meeting, he told Bradford that he had purchased the store, showed him a copy of the sales
contract, and expressed interest in executing a long-term lease.  He further testified  Bradford congratulated him on his purchase of the store, checked the mall
files on the property, and told Vento the $770 rent Taylor had been paying was Aa decent deal.@  According to Vento, Bradford accepted the $770 October rent check, told Vento he Aprobably@ could arrange a lease for up to three to six months, and in response to Vento=s expressed interest in a new lease, told him not to worry, to come
back in January, at which time he would Atake care of@ Vento=s concerns.  Although Vento
asked specifically about arrangements for a new lease and Bradford reviewed the store=s lease file during the meeting, Bradford  failed to advise Vento that
additional rent would be due for December and that he would be required to
apply for a new lease. 








The jurors
could reasonably have concluded that Bradford knew Vento was the new owner and that he acknowledged Vento=s ownership by congratulating him and accepting the October rent
payment from him.  Bradford admitted that he reviewed the store=s file during his meeting with Vento in response to Vento=s inquiries about a long-term lease. 
Vento testified that neither  Bradford
nor Taylor ever showed him a copy of the exising lease, even though he
requested a copy from Taylor on several occasions.  Vento=s questions to Bradford about the lease were sufficient to show Vento=s ignorance about the lease and Bradford=s knowledge that Vento lacked such information.

 Vento testified Bradford failed to inform him that the lease was non-assignable and he would
be required to reapply as a prospective tenant, and that an additional amount
of rent was due for December.  The jury
could reasonably have concluded Bradford chose not to disclose such information in order to induce Vento to
retain the store in its mall location.

Moreover, Bradford=s assurance that he would Atake care of@ Vento=s long-term lease concerns in January and his failure to disclose
pertinent information regarding the procedures for obtaining a new lease
constituted a partial disclosure which conveyed a false impression.  A duty to disclose information may arise when
one makes a partial disclosure and conveys a false impression.  See Formosa Plastics, 941 S.W.2d at 147.  When
Bradford responded to Vento=s inquiries about a new lease by accepting the rent check in the
amount of $770 and telling Vento he would Atake care of@ him in January, he conveyed the false impression that any rent
increase would not occur until January at the earliest, and that executing a
new lease was a mere formality.  








Vento relied
on Bradford=s assurances that he would Atake care of@ him in January and did not demand a copy of the lease from Bradford.  As a result, Vento testified
that he lost his inventory and personal collection, which Taylor sold, and for which the mall collected a percentage of the sales
revenues.  After considering the
evidence, we find there is legally and factually sufficient evidence to support
the jury=s finding of fraud, and accordingly, overrule appellants= second point of error.

                                                            IV.

                                                  Civil
Conspiracy

A civil
conspiracy is a combination by two or more persons to accomplish an unlawful
purpose or to accomplish a lawful purpose by unlawful means.  Triplex Communications, Inc. v. Riley,
900 S.W.2d 716, 719 (Tex. 1995).  Civil conspiracy
requires specific intent, that is, the parties must be aware of the harm or
wrongdoing at the inception of the combination or agreement.  Id.  

Appellees
point to three incidents of alleged civil conspiracy.  The first was a plan between Bradford and
Taylor to oust Vento from his store and sell Vento=s merchandise, with Taylor and the mall gaining the proceeds. 
The second was the lease signed by Bradford and Taylor on October 17,
which authorized Taylor to sell the business=s merchandise in the mall, when both knew that the merchandise now
belonged to Vento.  The third involves
the unjustified refusal of Bradford, Simon, and Golden to accept Louis Martin=s check to pay Vento=s debts unless Vento also agreed to sign a statement releasing the
mall from all liability.  








Adopting the
proper approach to the evidence when conducting legal sufficiency review, that
is, viewing all of the evidence in the light most favorable to the appellees,
indulging every reasonable inference in their favor, and remaining mindful that
the jury was free to resolve contradictions in the testimony and disbelieve the
uncorroborated testimony of any interested witness, the testimony in this case
is distilled this way:  Vento bought the
business from Taylor for $7000.  Vento
went to Bradford=s office to pay the $770 rent for October, where he told Bradford that he and Taylor were no longer partners but rather that he now
owned the business outright.  Bradford responded to Vento=s inquiries about a long-term lease by telling him Anot to worry@ with it that month and that he would Atake care of@ Vento in January.  Two days
later, Taylor and Bradford spoke briefly about a likely confrontation between
Vento and Taylor.  When the confrontation
came and the police turned to Bradford for guidance, he told them that Taylor, not Vento, was the rightful
owner of the business, and told them to eject Vento under the threat of
criminal trespass charges if he returned. 
Eleven days after that, Bradford entered into a lease agreement for November and December with Taylor, despite knowing that Taylor had sold out to Vento.  








When Vento
was able to reenter his store under an injunction, $35,000 - $40,000 worth of
merchandise was missing.  Although Vento
was back in control of the business, he was unable to pay the full December
rent or the past due debts of the company, and he was locked out of the
business for his failure to pay these debts. 
When Vento arranged for a buyer to satisfy his debts, Bradford and the
other mall office employees initially insisted that Vento release the mall from
all claims before permitting him to show his merchandise to the potential
buyer.  The buyer left without completing
the sale and did not return until Vento was permitted to show him the store
without signing the release form.  When
Vento was allowed to reenter the store, he found that more merchandise was
missing.  It is undeniable from these
facts that Vento was wronged by these events. 
However, the weakness in the appellees= civil conspiracy allegation is the paucity of evidence showing that
Bradford and Taylor agreed to work together.

Appellees
refer us to International Bankers Life Ins. Co. v. Holloway, 368 S.W.2d
567, 581 (Tex. 1963), which stated that, in conspiracy cases, 

the
injured party must necessarily have recourse to circumstantial evidence.  For it is only by the inferences and
deductions which men properly and naturally draw from the acts of others in
such cases, that their intentions can be ascertained.  They are not likely to proclaim them in the
hearing of witnesses.

 








To that end, appellees point to several
pieces of circumstantial evidence in support of the jury=s verdict.  Appellees argue that
the evidence shows a close relationship between Bradford and Taylor, pointing
to Taylor=s low rent, Bradford=s apparent lack of concern that Taylor may have been shortchanging the mall on the percentage of his store=s sales owed to the mall, and the Christmas tree deals between the
two. Appellees argue that Bradford was motivated by a need to recover money owed to the mall by Taylor,
who had proven to be unreliable in meeting his financial obligations.  Under this theory, Bradford and Taylor
plotted to induce Vento to bring his merchandise into the store and then remove
him, leaving Taylor to sell Vento=s merchandise, which would enable Taylor to pay off his debts while also allowing a profit for both of them.[6]  Appellees also suggest that Bradford was looking forward to removing the sports memorabilia store from the
mall altogether and replacing it with a different kind of store. 

We will
first examine appellees= pieces of circumstantial evidence one at a time.  We first consider whether the rent on Taylor=s store indicates whether Bradford and Taylor had a close relationship
wherein Bradford offered special favors to Taylor.  Bradford testified that Taylor was part of the mall=s ARetail Development Program@ (RDP), a program that offered reduced rental rates for small
businesses.   Taylor=s acceptance into the RDP and his negotiation for a base rent of $770
both preceded Bradford=s arrival at the mall in March, 1993. 
At any given time, there were approximately two dozen other RDP tenants
in the mall.  Bradford also testified that if Taylor were not operating his store in the space, the space would be empty
because there were more spaces at the mall than tenants to fill them.  This testimony was clear, positive, direct,
and could be readily contradicted if untrue. 
Lofton, 777 S.W.2d at 386. The record evidence does not provide
any indication that Taylor received preferential treatment from Bradford regarding his rent.








We next
consider Bradford=s attitude about Taylor shortchanging the mall on its percentage of the store=s sales.  Vento testified that
he told Bradford that Taylor had been under-reporting his sales to avoid paying overages, but Bradford Ajust raised his hands and said =what are you going to do about it. 
You know, what can I do?=@  Vento also testified that Athere was no auditing system@ in the mall for checking the sales reported by mall tenants.  It appears from Vento=s own testimony that while Bradford may have been somewhat lax about collecting the overages, there was
no indication that Bradford showed any special preference for Taylor in this regard.  Bradford testified that one to three tenants would be audited each year, and
that the mall always selected tenants from whom it was likely to get the most
money out of the audit.  RDP tenants were
never audited because the audits were very expensive and the mall would not
recoup the cost of the audit.  This
testimony was also clear, positive, direct, and could be readily contradicted
if untrue.  Lofton, 777 S.W.2d at
386.  We conclude that Bradford=s attitude regarding the overages from Taylor=s store does not lend any support to appellees= conspiracy theory.

Appellees
also questioned Bradford=s practice of continuing to do business with Taylor involving the sale of Christmas trees after Taylor had failed to pay the electricity bills for the store.  Taylor and his wife were the local
representatives of Sunnyview Christmas Tree Farm, a company that sold Christmas
trees and negotiated leases for space to sell the trees in the mall parking
lot.  Bradford explained that Sunnyview always paid their rent up front, and there
had never been any trouble with Sunnyview at the mall.  Neither Taylor nor his wife were ever involved
in any of the lease negotiations between the mall and Sunnyview.  Here again, we fail to see how Bradford=s willingness to continue doing business with Sunnyview provides even
circumstantial evidence of a conspiracy between Bradford and Taylor.








We next
consider Bradford=s possible financial motivations for conspiring to remove Vento and
reinsert Taylor.  One of the premises of this
theory is appellees= argument that Taylor had become unreliable in meeting his financial obligations.   Appellees argue ATaylor couldn=t pay rent without bouncing checks and he hadn=t paid electricity since May.@  It is true that Taylor had a history of bouncing rent checks.  However, Bradford testified that Taylor always Amade up@ his payments.  The mall had
also taken steps to relieve themselves of the inconvenience of bounced checks
from Taylor by requiring him to pay his rent by cashier=s check.  Regarding the unpaid
electricity bills, it is important to note that, according to Vento, he and Taylor
became partners in May or June. 
Therefore, Vento would also be liable for a portion of the unpaid
electric bills.  We agree with appellees
that there is some evidence indicating that Taylor=s bill-paying habits were not very good.  

Of course,
this evidence was presented not merely to show that Taylor=s bill-paying habits were not very good, but to suggest that, by
tolerating Taylor=s debt-prone habits, Bradford showed preferential treatment for Taylor, which, in turn, supports the likelihood that the two would later
conspire together.  However, a chain of
inferences can only be stretched so far before it breaks.  Vital facts may not be proven by unreasonable
inferences or by piling inference upon inference.  Bernstein v. Portland Sav. and Loan Assoc., 850 S.W.2d 694, 706 (Tex. App.--Corpus Christi 1993, writ
denied).  We believe appellees= argument stretches the evidence past the breaking point.








This brings
us to the next premise in appellees= argument, that it served Bradford=s financial interests to have Taylor, not Vento, running the
store.  Appellees= theory is that Bradford needed Taylor to remain at the mall so he could make enough to pay the money he
owed for electricity.  However, as
mentioned above, Vento was also liable for approximately half of the
electricity bills.[7]  Appellees also discuss how
inducing Vento to move his merchandise into the store and then replacing him
with Taylor allowed the mall to profit from the overages that would be made on
Vento=s merchandise.  Even disregarding
the argument made elsewhere by appellees concerning Taylor=s habit of under-reporting his sales to avoid paying overages (which
would suggest that Vento was preferable to Taylor as a tenant), it is not
apparent why it would be more profitable to the mall to have Taylor selling
Vento=s merchandise than it would be to have Vento selling Vento=s merchandise.  All Bradford stood to gain by conspiring to reinstall Taylor was an improved chance to recover the portion of the store=s unpaid electric bills that Taylor was individually liable for.  Taylor had also indicated several times that he wanted to get out of the
business, while Vento was eager for a long-term lease.  It appears contrary to Bradford=s long-term interests to permanently sabotage Vento=s business, when all he stood to gain was recovery of a portion of the
unpaid electric bills.  Although
appellees suggest that Bradford desired to replace the sports memorabilia store with a different kind
of store, the evidence indicates that the mall had vacant spaces for other
tenants whether the sports memorabilia store left or not.  








We hold that
the evidence was insufficient to support a finding that Bradford and Taylor
conspired to oust Vento from the store during the first week of October and
replace him with Taylor. 

Next, we
consider the alleged conspiracy centering around the lease agreement entered
into by Bradford and Taylor on October 17, wherein Taylor was given a lease for November and December.   The lease was obviously a combination by two
or more persons.  However, we hold that
the evidence was legally insufficient to show that Bradford knew that the lease to Taylor was for an unlawful purpose. 
If there were evidence that Bradford knew the lease would have the effect of facilitating Taylor=s sale of Vento=s merchandise, that would constitute evidence that Bradford knew that the lease was for an unlawful purpose.  However, because the evidence shows that Bradford received conflicting information from Taylor and Vento regarding the
ownership of the business, the evidence does not establish that Bradford knew conclusively that the business belonged to Vento.  








Vento
testified that on October 4 he told Bradford that he had bought the business from Taylor, and that he showed Bradford the contract.[8]  However, on October 6, Bradford encountered a confrontation between Taylor and Vento, with both
claiming ownership.  Thereafter, Vento
left the mall and according to his own testimony, did not return to the mall or
have any further contact with Bradford for several weeks.  Vento did
not file his original petition contesting ownership of the business until November 8,
 1994, roughly three weeks after Bradford and Taylor entered the
lease.  We hold that the evidence was
legally insufficient to establish that Bradford knew Vento owned the business and that leasing to Taylor would be unlawful.  








Regarding
the allegation of a conspiracy between Bradford, Simon, and Golden in demanding a release from Vento of his claims against
the mall, appellants respond that it is a rule of law that agents and their
principals cannot conspire together, citing Fojtik v. First Nat=l Bank, 752 S.W.2d 669, 673 (Tex. App.--Corpus Christi 1988), writ denied
per curiam, 775 S.W.2d 632 (Tex. 1989).  All parties concede
that Bradford was the agent of Simon and Golden. 
Appellees argue, however, that there is no evidence to show that Simon
and Golden were the same company, or that one was the subsidiary of the other,
citing Atlantic Richfield Co. v. Misty Prod., Inc., 820 S.W.2d 414, 420
(Tex. App.--Houston [14th Dist.] 1991, writ denied) (a corporation can not
conspire with itself, no matter how many corporate agents participate in the
alleged conspiracy).  The record provides
scant indication of the relationship between Simon and Golden.  There is only passing mention that they are Aowners,@ with no further explanation provided. 
However, as the plaintiffs, appellees had the burden of providing
adequate evidence to support their conspiracy cause of action.  Therefore, they had the burden of proving
that Simon and Golden were separate entities (and therefore could conspire
together) rather than appellants having the burden of proving otherwise.  Appellees failed to meet this burden.  Appellants= first point of error is sustained.

                                                             V.

Tortious
Interference with Prospective Contracts

We next
consider appellants= challenges to the jury finding that they tortiously interfered with
appellees= prospective contractual relations. 
Appellants contend that appellees waived their right to recover on this
cause of action by failing to secure a finding from the jury that they suffered
damages as a result of this tortious conduct. 
We disagree. 

Appellants= complaint centers around a typographical error in the jury
charge.  The jury charge in this case was
designed so that first the jury was asked about liability and then an
accompanying question asked about damages. 
For example, question 1 asked ADid any of the defendants commit fraud against Roell Vento?@  The jury was instructed that,
if they answered question 1 with a AYes,@ they should answer question 1A, which asked about damages. 








Question 8,
which asked the jury about the elements of liability for tortious interference,
specifically asked ADid any of the defendants listed below wrongfully interfere with
plaintiff=s prospective contractual relationships with their customers,
proximately causing damages?@  The jury answered Ayes@ to defendants Taylor and Bradford, but answered Ano@ to defendants Simon and Golden Ring. 
Question 8A was prefaced with the instruction: AIf you answered question 8 AYes@ then answer this question. 
Otherwise do not answer the following question.@  However, question 8A actually
asked AWhat sum of money, if paid now in cash, would fairly and reasonably
compensate the plaintiffs for damages, if any, you attribute to the conduct
complained of in question no. 3 ?" (emphasis added).  Question 3 asked the jury whether Taylor had breached his fiduciary duty as a partner to Vento.  Appellees argue that the reference in
question 8A to question 3 rather than question 8 is undoubtedly a typographical
error.  We agree.  Throughout the jury charge, which ran
thirty-three pages and included nineteen questions, the charge was consistently
organized such that the jury was first asked about liability, and then, if they
answered yes, an accompanying question asked about damages.  The liability and damages questions shared
the same question number for all causes of action except tortious interference
with business relations.  A jury=s verdict should not be reversed based on a typographical error.  See Miller v. State, 846 S.W.2d 513,
515 (Tex. App.--Texarkana 1993, pet. ref=d) (conviction should not be reversed because of typographical error
in the jury charge); see also Fain v. State, 688 S.W.2d 235, 238-89
(Tex. App.--El Paso 1985, aff=d 725 S.W.2d 200 (Tex. Crim. App. 1986)) (typographical error in jury
charge susceptible to lay, common sense correction not grounds for reversal).  We hold that the amount of damages listed by
the jury in question 8A was properly incorporated into the court=s judgment as damages for tortious interference with prospective
contractual relations, and overrule appellants= third point of error.








To establish
a cause of action for tortious interference with a prospective business
relationship, the plaintiff must show: 
(1) a reasonable probability that a contractual relationship would have
been entered;  (2) an intentional,
malicious intervention with the formation of that relationship;  (3) without privilege or justification;[9]  and (4) resulting in actual
damage or loss.  Hill v. Heritage
Resources, Inc., 964 S.W.2d 89, 109 (Tex. App.CEl Paso 1997, pet. denied) (citing Gonzalez v. San Jacinto
Methodist Hosp., 905 S.W.2d 416, 421 (Tex. App.‑‑El Paso 1995),
rev'd on other grounds sub nom., Calvillo v. Gonzalez, 922 S.W.2d
928 (Tex. 1996)); see also Garner, 944 S.W.2d at 477.   It is not necessary to prove that the
contract would have certainly been made but for the interference; it must be
reasonably probable, considering all of the facts and circumstances attendant
to the transaction.  Hill, 964
S.W.2d at 109.








The
prospective contractual relations identified by appellees were Vento=s prospective contracts with the customers of his store, and later the
prospective contract with Louis Martin to sell the business.  In the present case, the charge to the jury
regarding tortious interference with prospective contractual relations omitted
the element of absence of justification, but no objection was raised at trial
regarding the omission.  A review of the
evidentiary basis of a  judgment includes
both questions asked and questions omitted. 
Crosbyton Seed Co. v. Merchura Farms, 875 S.W.2d 353, 364 (Tex.
App.CCorpus Christi 1994, no writ). 
When a jury awards damages based on a charge that omits an element
necessary to sustain a ground of recovery, the trial court can either file a
written finding regarding the missing element or render judgment without
one.  See Tex. R. Civ. P. 279; State Farm Life Ins. Co. v. Beaston,
907 S.W.2d 430, 437 (Tex. 1995).  If, as in the present
case, the trial court does not file a written finding, the omitted element is
deemed found in support of the judgment as long as no objection was made and
the evidence supports such a finding.  See
Tex. R. Civ. P. 279; State
Farm, 907 S.W.2d at 437.  The deemed
findings must be supported by factually sufficient evidence.  Merchura Farms, 875 S.W.2d at 364.








We first
consider the contract to sell the business to Louis Martin.  When Vento and Martin went to the mall office
wishing to settle Vento=s debts and view the business=s merchandise to reassure Martin before the sale, they were told that
they would not be permitted to enter the store until Vento signed a release
form releasing the mall from all liability. Martin testified that if he had
been permitted to view the store on the day he and Vento went to the mall office,
he would have refused to consummate the deal due to the disheveled state of the
store=s merchandise.  While Vento
insinuates that Bradford and/or Taylor are responsible for the Atotal disarray@ and missing merchandise, there is no evidence of who caused this
destruction.  Most importantly, there is
no evidence that the destruction took place during the week between the day
Vento and Martin went to the mall office and the day Vento was allowed to
remove his merchandise.  Without evidence
that the destruction occurred that week, we may not presume that the store was
in better condition on the first date, and Martin testified that his initial
offer was premised on finding the store and its merchandise in good
condition.  We conclude that there is no
evidence that Bradford=s demand for a release interfered with Vento=s contract with Martin.  

However,
legally and factually sufficient evidence does support appellants= recovery for the prospective contracts with Vento=s customers.  The evidence shows
a reasonable probability that contractual relations would have been entered
into.  Vento had considerable experience
in selling sports memorabilia, a large collection of merchandise, and an
established and expanding customer base. 
He also testified to the volume of customer sales at the store during
his association with Taylor and following his purchase of the store.  








Appellants
contend that appellees have failed to satisfy this element of the cause of action
because they failed to identify any specific contract that had been interfered
with, citing Robles v. Consolidated Graphics, Inc., 965 S.W.2d 552,  561 (Tex. App.--Houston [14th Dist.] 1997,
pet. denied).  We do not agree that Robles
supports appellants= position, or that appellants= position is a correct statement of the law.  The actual holding in Robles was to
uphold a summary judgment in favor of the defendant on the ground that one
prospective contract was illegal and unenforceable as against public policy,
and, with regard to the other contract at issue, the defendant=s conduct was justified.  Robles,
965 S.W.2d at 561.  Although the facts of
Robles concern specific contracts, there is no language in the Robles
opinion requiring the identification of specific contracts.  Rather, all Texas law requires is Aa reasonable probability that the parties would have entered into a
contractual relationship.@  Garner, 944 S.W.2d at
477.      

 

 








There is
also sufficient evidence to support the second element, an intentional and
malicious intervention with the formation of the contractual relationship.  Vento testified he told Bradford that he had purchased the store and showed him the signed sales
contract during the October 4 meeting. 
According to Vento, when the police were called to the store two days
later on October 6, in response to the dispute between Vento and Taylor,
Bradford failed to tell the police of his knowledge regarding  Vento=s claims of ownership or even that it was his understanding that Vento
was in the process of purchasing the store; instead, he unequivocally told the
police Athe store belongs to Tom [Taylor].@  Vento also testified that he
was forced to leave the store and deprived of any opportunity to conduct
business when, at Bradford=s direction, the police advised him to leave the store and threatened
to arrest him on charges of criminal trespass if he returned. 

The evidence
similarly supports the deemed finding of the third element, absence of
privilege or justification.  As manager
of the mall, Bradford may have been justified in telling the police that although ownership
of the store was in dispute, the mall=s records nonetheless reflected that Taylor was the leaseholder of a non-assignable lease.  Bradford was not justified, however, in telling the police that Taylor owned the store, without mentioning that Vento had paid the rent two
days earlier and had told him he was the new owner.

The jury
considered the emotional distress, mental anguish, and lost profits caused by Bradford=s tortious conduct, and found that the Ventos would be fairly and
reasonably compensated for such tortious interference by awarding them $20,000
in damages for lost profits and $10,000 in damages for mental anguish.  As a result of Bradford=s statements to the police, Vento was denied access to his property
and  deprived of the opportunity to
conduct business from October 6 until November 23, 1994, at which time he
returned to the store to find the value of the store=s inventory was approximately $35,000 to $40,000 less than it had been
on October 6 when he was ejected from the property.  We hold the evidence shows that Vento
suffered damages because of Bradford=s tortious conduct, and overrule appellants= fourth point of error.








                                                            VI.
 

Intentional
Infliction of Emotional Distress








Next, we
consider appellants= challenge to the legal and factual sufficiency supporting the jury
finding in favor of appellees on their claim for intentional infliction of
emotional distress.  To recover under
this tort, the plaintiff must prove that 1) the defendant acted intentionally
or recklessly, 2) the conduct was "extreme and outrageous," 3) the
actions of the defendant caused the plaintiff emotional distress, and 4) the
resulting emotional distress was severe. 
Wornick Co. v. Casas, 856 S.W.2d 732, 734 (Tex. 1993).  The Aintent@ element of this tort requires that the actor either intend to cause
severe emotional distress, or that severe emotional distress be the primary
risk created by the actor=s conduct.  Standard Fruit
and Vegetable Co., Inc., et. al. v. Johnson, No. 97-0976, 1998 Tex. LEXIS 166, at *2 (Tex. December 31, 1998).[10]  Rude behavior does not
equate to outrageousness, and behavior is not outrageous simply because it is
tortious.  Natividad v. Alexsis, Inc.,
875 S.W.2d 695, 699 (Tex. 1994).  Rather, the Aoutrageous@ element is meant to require behavior that is Abeyond all possible bounds of decency, and to be regarded as
atrocious, and utterly intolerable in a civilized community.@  Twyman v. Twyman, 855
S.W.2d 619, 621 (Tex. 1993).  ASevere emotional distress" means distress so severe that no
reasonable person could be expected to endure it without undergoing
unreasonable suffering.  Benavides v.
Moore, 848 S.W.2d 190, 195 (Tex. App.‑‑Corpus Christi 1992,
writ denied).  

Appellees
point to six actions taken by Bradford which they argue were extreme and outrageous.  They are: (1) misleading Vento into believing
he was secure in his status as a tenant; (2) conspiring with Taylor to deprive
him of the business and his personal collection, much of which was located in
the store; (3) lying to the police about who owned the business and threatening
Vento with trespass charges; (4) subsequently entering a lease with Taylor that
facilitated Taylor=s sale of Vento=s property; (5) allowing Vento=s property to be ransacked and stolen while Vento was locked out of
the store; and (6) demanding that Vento release all claims before releasing a
key when Vento and Martin came to pay Vento=s debts and see the store.








The evidence
supports the jury=s finding of liability for intentional infliction of emotional
distress.  Bradford=s threatening Vento with criminal trespass charges, his unequivocal
statement to the police that Taylor was the owner of the store, and his failure
to inform the police of the dispute over ownership  are evidence that Bradford=s conduct was extreme and outrageous and caused Vento to suffer severe
emotional distress.  The jury could
reasonably have concluded that Bradford=s conduct was intended or primarily likely to cause Vento severe
emotional distress. Vento testified that at Bradford=s direction, he was forced to leave the store on October 6 without
being allowed to retrieve any personal belongings, including items from his
personal collection.  He also testified
that following his ejection from the store, he became depressed and physically
ill, lost weight, suffered nausea and loss of appetite, and was embarrassed and
humiliated by having to explain his plight to former customers.  He testified that sports memorabilia
collectors and dealers are a Avery tight@ community, that people heard that Asomething is going on,@ and that his reputation and credibility were irreparably damaged by
being Athrown out@ of his own store.  

Appellees
also identified Bradford=s refusal, in January 1995, to allow Vento access to the property
unless he agreed to execute a release of all claims against the mall.  Vento had requested access for the limited
purpose of showing the property to Louis Martin, a prospective buyer.  Bradford=s conduct was extreme because it was unjustified, unnecessary to
protect the mall=s interests, and interfered with Vento=s opportunity to sell the property. 
Moreover, the jury could reasonably have concluded that the Aprimary risk@ created by Bradford=s conduct was severe emotional distress for Vento.  We find the evidence legally and factually
sufficient to support the jury=s finding of liability for intentional infliction of emotional
distress and overrule appellants= fifth point of error.

                                                            VII.


Single Injury; Joint and Several Liability
for Actual Damages;

Improper Stacking of Damages

 








Appellants
contend that, if we determine that the jury=s finding of a civil conspiracy was not supported by legally
sufficient evidence, then there is no basis for making the appellants
jointly and severally liable for the damages attributable to Taylor.  However, a civil conspiracy
is not the only basis for imposing joint and several liability.  Joint and several liability is also
appropriate when the tortious acts of multiple tortfeasors combine to produce a
single, indivisible injury.  Austin
Road Co. v. Pope, 216 S.W.2d 563, 565 (Tex. 1949); Bristol‑Myers Co. v. Gonzales, 548 S.W.2d 416,
427 (Tex. Civ. App.-‑Corpus Christi 1976, rev=d on other grounds, 561 S.W.2d 801 (Tex. 1978)). 
The term Aindivisible injury@ means an injury which from its nature cannot be apportioned with
reasonable certainty to the individual wrongdoers.  Amstadt v. United States Brass Corp.,
919 S.W.2d 644, 654 (Tex. 1996) (citing Landers v. East Tex. Salt Water Disposal Co.,
248 S.W.2d 731, 734 (Tex. 1952)).

This is such
a case where the injuries suffered by the Ventos cannot be apportioned with
reasonable certainty to the individual wrongdoers.  For example, the mental anguish suffered by
the appellees that resulted from Taylor=s fraud and breach of fiduciary duty cannot be distinguished from the
mental anguish suffered as a result of Bradford=s tortious interference with prospective contractual relations.  Similarly, it is not possible to separate the
profits lost by the appellees as a result of Taylor=s wrongdoing from the profits lost as a result of Bradford=s wrongdoing. The tortious acts of Bradford and Taylor, although not
executed pursuant to any concerted scheme, nevertheless combined in effect to
produce singular, indivisible injuries to the appellees that cannot be
apportioned among the appellants.








It seems
most appropriate to us that, in a case such as this, involving multiple
defendants and multiple causes of action which nevertheless produce a single
injury, the jury should first be asked about liability issues, and then, if
they have made findings sufficient to impose liability, the jury should be
instructed to answer one set of damages questions that simultaneously pertains
to all the causes of action and all of the defendants.  However, the jury charge in this case required
that the jury assess the damages for each cause of action, and the jury found
differing amounts for the various types of damages under the various causes of
action.  The relevant jury findings are
described in this table:


 
 
  
 Question Number
 
 
 
  
 Cause of Action
 
 
 
  
 Liable Defendants
 
 
 
  
 Type of Damages
 
 
 
  
 Amount of Damages 
 
  
 
 
 


 


 
 
  
 1A
 
 
 
  
 fraud
 
 
 
  
 Bradford
 Taylor
 Simon &
 Golden 
 
 
 
  
 property lost in reliance 
 
 
 
  
 $14,000
 
 
 
 
 
  
 1A
 
 
 
  
 fraud
 
 
 
  
 Bradford
 Taylor 
 Simon &
 Golden
 
 
 
  
 mental anguish
 
 
 
  
 $750,000
 
 
 


 


 
 
  
 3A
 
 
 
  
 breach of fiduciary duty
 
 
 
  
 Taylor
 
 
 
  
 lost profits
 
 
 
  
 $100,000
 
 
 
 
 
  
 3A
 
 
 
  
 breach of fiduciary duty
 
 
 
  
 Taylor
 
 
 
  
 mental anguish
 
 
 
  
 $250,000
 
 
 


 


 
 
  
 6B
 
 
 
  
 DTPA Alaundry list@
 
 
 
  
 Bradford and Taylor
 
 
 
  
 lost use of property
 
 
 
  
 $100,000
 
 
 
 
 
  
 6B
 
 
 
  
 DTPA Alaundry list@
 
 
 
  
 Bradford and Taylor
 
 
 
  
 expenses
 
 
 
  
 $20,000
 
 
 
 
 
  
 6C
 
 
 
  
 DTPA Alaundry list@
 
 
 
  
 Bradford and Taylor
 
 
 
  
 lost profits
 
 
 
  
 $100,000
 
 
 


 


 
 
  
 8A
 
 
 
  
 tort. interference with contract
 
 
 
  
 Bradford and Taylor
 
 
 
  
 lost profits
 
 
 
  
 $20,000
 
 
 
 
 
  
 8A
 
 
 
  
 tort. interference with contract
 
 
 
  
 Bradford and Taylor
 
 
 
  
 mental anguish
 
 
 
  
 $10,000
 
 
 


 


 
 
  
 10
 
 
 
  
 DTPA Aunconscionable@
 
 
 
  
 Bradford and Taylor
 
 
 
  
 omitted
 
 
 
  
 omitted
 
 
 


 

Therefore, we are confronted with mental
anguish findings of $750,000, $250,000, and $10,000; lost profits findings of
$100,000[11] and $20,000; and a finding of $14,000 in property lost in
reliance on fraud.  

 

 

 








Texas recognizes the Aone satisfaction@ rule, which prevents a plaintiff from obtaining more than one
recovery for the same injury.  Stewart
Title Guar. Co. v. Sterling, 822 S.W.2d 1, 7 (Tex. 1991).  This rule applies when
defendants commit the same act as well as when defendants commit differing acts
which result in a single injury.  Id.  A jury award of differing
amounts for the same type of damages under different causes of action does not
prevent the application of the one satisfaction rule if the plaintiffs suffered
only one injury.  Berry Property
Management v. Bliskey, 850 S.W.2d 644, 666 (Tex. App.--Corpus Christi 1993
writ dism=d by agr.).  Where the prevailing
party has not elected a single recovery from among the jury=s findings, the court should use the findings affording the greater
recovery and render judgment accordingly. 
Birchfield v. Texarkana Mem=l Hosp., 747 S.W.2d 361, 367 (Tex. 1987).  Applying this rule to
the facts of this case, we hold that the Ventos are limited to electing only
$750,000 in mental anguish damages, $100,000 in lost profits, and $14,000 in
property lost in reliance on fraud.[12]  Because the wrongful acts of
Taylor and Bradford combined to produce these damages and the damages cannot be
reasonably apportioned between them, the appellants are jointly and severally
liable with Taylor for  the full amount of actual
damages which survives appellants= various challenges in this appeal.

 

 

 

                                                            VIII.

DTPA








Finally, we
consider appellants= challenge to the jury finding in favor of appellees on their DTPA
claim and the appellees= cross point which argues that the trial judge erred in requiring them
to elect between remedies, which prevented them from recovering the damages
awarded by the jury on their DTPA cause of action.  

The elements
of a DTPA Alaundry list@ cause of action are: (1) the plaintiff is a consumer, (2) the
defendant engaged in a false, misleading, or deceptive act or practice, (3)
that was relied on by the consumer, and (4) that constituted a producing cause
of the consumer's actual damages.  Tex. Bus. & Com. Code Ann. ' 17.50(a)(1) (Vernon 1987).[13]  Although the appellants argue
that there was insufficient evidence that Bradford committed a Alaundry list@ DTPA violation, they did not challenge the sufficiency of the
evidence supporting a violation by Taylor, and we have determined that the appellants are jointly and severally
liable for the actual damages assessed by the jury on all causes of
action.  Furthermore, the damages found
by the jury on the Alaundry list@ DTPA claim are no greater than those found by the jury on other
causes of action brought by the appellees, which we have already found to be
supported by factually and legally sufficient evidence.  Therefore, the appellants= arguments that Bradford did not commit a Alaundry list@ DTPA violation are moot.








The jury
also found that Taylor and Bradford had committed DTPA Aunconscionable@ violations.  The elements of a
DTPA Aunconscionable@ cause of action are (1) the plaintiff is a consumer, (2) the
defendant engaged in an unconscionable action or course of action, (3) that
constituted a producing cause of the consumer's damages.  Tex.
Bus. & Com. Code Ann. '' 17.50(a)(1); 17.50(a)(3) (Vernon Supp. 1987).[14]  An "unconscionable action
or course of action" is "an act or practice which, to a consumer=s detriment, takes advantage of the lack of knowledge, ability,
experience, or capacity of the consumer to a grossly unfair degree" or Aresults in a gross disparity between the value received and
consideration paid, in a transaction involving transfer of consideration.@  Tex. Bus. & Com. Code Ann. ' 17.45(5) (Vernon 1987).[15]  Proof that a defendant has
taken advantage of a consumer's lack of knowledge, ability or experience to a
grossly unfair degree requires proof of Aresulting unfairness that was glaringly noticeable, flagrant, complete
and unmitigated.@  Chastain v. Koonce, 700
S.W.2d 579, 584 (Tex. 1985).  For determining whether
one is a consumer under the DTPA, the Texas Supreme Court has adopted this
test: (1) acquiring or seeking to acquire goods or services by purchase or
lease and (2) those goods or services must be the basis of the complaint.  Id. at 581.








However, the
jury charge did not ask the jury to assess damages for this cause of
action.  The appellees urge us to
consider the entire actual damages awarded by the trial court, $1,274,000, as a
deemed finding on the damages issue under rule 279.  The judgment stated that ADefendants Simon Property Group L.P., Golden Ring Mall Company, Bruce
Bradford, individually and Tom Taylor individually are jointly and severally
liable for damages found by the jury in questions 1A, 3A, 8A, 9A, 11A(c) which
total $1,274,000.@  The actual total of the
amounts the jury awarded in the answers listed by the trial court is
$1,393,000.  Had the figure in the trial
court=s judgment exceeded the total amount the jury awarded for the
causes of action the trial court intended to include in the judgment, it might
be possible to infer that the trial court intended the excess to reflect a
deemed finding of damages for the Ventos= DTPA cause of action.  However,
because the trial court awarded less than the jury awarded for the
causes of action the trial court apparently intended to include in the
judgment, we cannot say that any of the trial court=s award of actual damages was meant to reflect a deemed finding of
damages for the Ventos= DTPA cause of action.          Furthermore, the trial court=s delineation of the amounts awarded by the jury for the various
causes of action that contributed to the overall actual damages award  works against the Ventos= argument that the judgment contains a deemed finding of damages on
their DTPA causes of action.  The court
did not include the Ventos= recovery under the DTPA in its itemization.  Therefore, it is not possible to conclude
that recovery of any amount of damages under the DTPA Asupport[s] the judgment.@  Tex. R. Civ. P. 279. 








The harm
caused to the appellees by the misconduct underlying both DTPA causes of action
was the same.  Therefore, the appropriate
damages on the appellees= DTPA Aunconscionable@ cause of action are no more than those awarded by the jury on the
appellees= DTPA Alaundry list@ cause of action, and it is of no consequence whether the appellees
recover on both of their DTPA theories or only one.  Therefore we need not rule on appellants= ninth point of error arguing that the evidence was legally and
factually insufficient to support recovery for the appellees on their DTPA
claims.

                                                             IX.

Mental
Anguish Damages

We have
determined that the appellees must select a single award for mental anguish
damages.   In this case, their fraud
cause of action, for which the jury awarded them $750,000 in mental anguish,
gave them the maximum recovery.

Mental
anguish damages may be awarded when there is direct evidence of the nature,
duration, or severity of the plaintiff=s anguish, thus establishing a substantial disruption in the plaintiff=s daily routine, or evidence of a high degree of mental pain and
distress that is more than mere worry, anxiety, vexation, embarrassment, or
anger. Parkway Co. v. Woodruff, 901 S.W.2d 434, 444 (Tex. 1995).  There must also be
evidence that the amount of mental anguish damages found is fair and
reasonable, and the appellate court must conduct a Ameaningful evidentiary review@ of the amount found.  Saenz
v. Fidelity Guar. Ins. Underwriters, 925 S.W.2d 607, 614 (Tex. 1996).

 

 








In this
case, Vento testified that when he was ejected from his property on October 6,
he was Aconfused, dazed, upset,@ and Aso mad [he] couldn=t even drive.@  He further testified: 

Q. 
So how did it feel knowing that you bought this store, got a loan for
it, thousand dollars of dollars (sic) and you literally kicked out of your own
store?

 

A. 
It feels like if they take, you knowC it=s like if they took you--- I don=t know.  I can=t explain it.  It=s unexplainable.  I mean, it
feels really bad.  Until it happens to
somebody you know what I mean.  They take
part of your life away.  Everything you
work for at that point, all the money we sunk in, all the inventory, personal
items, they just let some guy take it, you know.  It seems very simple for someone to just go in
and in three minutes ruin your life.  And
it takes you a struggle and two years, three years later to try to see if you
can get it back.  It feels bad. 

 

There
was evidence that Vento could not eat after these incidents, and became very
thin and ill as a result.  Debbie Vento
testified that he would not leave the house, and had to be Adragged@ to go work with his brother so that he wouldn=t be home all the time, thinking about what had happened to him.  Vento also testified that he frequently ran
into collectors and other people he had known in the sports memorabilia
business, and the embarrassment of those encounters was Athe worst part.@  Vento also testified that the
emotional effects of the events underlying this case had not improved as of the
time of trial.  We hold that the evidence
shows the nature, duration, and severity of Vento=s emotional distress, as well as a consequent substantial disruption
in his daily routine.  

 

 








We next must
consider the amount of damages awarded. 
Although the Texas Supreme Court has mandated Ameaningful evidentiary review@ of the size of mental anguish awards, the incorporeal nature of mental
anguish damages continues to make it a rare case where we can say that the jury=s findings are so against the great weight and preponderance of the
evidence as to be clearly wrong and unjust. 
Put simply, how can something so hazy as the dollar amount of mental
anguish damages be Aclearly wrong?@  While there may be some cases
where the amount awarded is clearly wrong, this is not one of those cases.  In this case, Vento had devoted his life to
building his collection with the ultimate goal of operating his own sports
memorabilia store.  Just as he was about
to realize that goal, it was wrongfully snatched from him, and he was put back
in a position from which it would take years to recover.  After reviewing the size of the jury=s award for mental anguish as meaningfully as we can, we hold that the
award of $750,000 in mental anguish damages is not so against the great weight
and preponderance of the evidence as to be clearly wrong and unjust, and
overrule appellants= sixth point of error.  See
id. 

                                                             X.

Lost
Profits








 We next consider appellees= recovery for lost profits. 
Here again, we have determined that the single injury rule requires that
the appellees be limited to a single recovery of $100,000. To recover for lost profits, a party must show
by competent evidence the amount of the loss with reasonable certainty.  Texas Instruments v. Teletron Energy Mgt., 877 S.W.2d 276, 279 (Tex. 1994).  It is not necessary
that profits should be susceptible to exact calculation; it is sufficient that
there be data from which they may be ascertained with a reasonable degree of
certainty and exactness.  Id. (quoting Southwest Battery Corp. v. Owen, 131 Tex. 423, 115 S.W.2d 1097, 1098‑99 (1938)); Thedford v. Missouri
Pac. R. Co., 929 S.W.2d 39, 49 (Tex. App.CCorpus Christi 1996, writ denied).  Where the business is established and making a
profit at the time when the contract was breached or the tort committed, such
profit, together with other facts and circumstances, may indicate with
reasonable certainty the amount of profits lost.  Texas Instruments, 877 S.W.2d at 279. 

What
constitutes reasonably certain evidence of lost profits is a fact intensive
determination.  Id. (citing Holt Atherton Industries, Inc. v. Heine, 835 S.W.2d
80, 84 (Tex.1992)).  The requirement of
"reasonable certainty" in the proof of lost profits is intended to be
sufficiently flexible to accommodate the myriad of circumstances in which
claims for lost profits arise.  Id.  Although supporting documentation may affect the weight of the evidence,
it is not necessary to produce the documents supporting the opinions or
estimates of lost profits.  Holt,
835 S.W.2d at 84.  








Much of the
appellants= argument on appeal is an attack on the testimony of the expert
witness who estimated Vento=s future earnings.  Appellants
argue that the expert relied on faulty information and employed faulty
methodology in arriving at his estimates. 
Many of the appellants= arguments are valid.  However,
even if the expert=s testimony is disregarded entirely, Vento=s own testimony provided legally and factually sufficient evidence to
support the jury=s finding on lost profits.

 








Vento
testified that in early 1994, prior to purchasing the store, he and Taylor had
an agreement whereby Vento received thirty percent of the store=s net profits from sales at the end of each month.  He further testified that after all store
expenses were paid, his share of the monthly profits was approximately $1500 to
$2000.  In July 1994, Vento and Taylor
became partners and Vento=s share of the profits increased to fifty percent.  He testified that his half of the profits for
July 1994 was approximately $2400, but that July was Aa slow month,@ and that, in general, business picked up during the fall months.  If the profits were $4800 in a slow month,
the jury could have concluded that the store made enough money during its Aslow@ periods to stay in business and enjoy greater profits when business
improved. Moreover, Vento testified that his purchase of the store expanded the
store=s customer base by drawing business from his own well-established
customers.  Were it not for the $35,000 -
$40,000 depletion of inventory that took place during the period Vento was
exiled from the store, he probably could have handled the unexpected financial
burdens (i.e., higher rent in December and unpaid electricity bills) he
encountered when he returned, and remained in business for years to come.   Appellants argue that the evidence was too
speculative, contingent, and uncertain because of fluctuating market conditions
in the sports memorabilia business. 
There was evidence that the sales of a sports memorabilia store tend to
go up and down depending on what=s happening in sports, particularly depending on whether local teams
are doing well.  Appellants also point to
Bradford=s testimony that sports memorabilia stores, although they may enjoy
brief or seasonal success, do not do well in the long run.  Obviously the jury was free to disbelieve Bradford=s testimony.  While the sports
memorabilia business apparently went through periods that were less lucrative
than others, we do not agree that the profitability of the business was so
uncertain as to preclude recovery for lost profits.








Appellants argue
that Vento would not have received a new lease from the mall, which would have
prevented him from earning the lost profits awarded by the jury.  There are two flaws in this argument.  First, the jury could reasonably have
concluded that were it not for Bradford and Taylor=s misconduct, Vento would have been in 
financially sound condition and on good terms with the mall, and could
have easily obtained a new lease.  The
second flaw is that even if Vento had been unable to obtain a new lease at
Valle Vista mall, the jury could have reasonably determined that Vento would
have moved his business to another mall of comparable size.  Vento testified that a network exists among
collectors and many sport collectors spend a great deal of time seeking out the
merchandise they want.  From this
testimony, it would be reasonable for the jury to conclude that many of Vento=s customers would follow him to a new location.  Based on Vento=s testimony, the jury could reasonably have found that the appellees
would be fairly compensated by awarding him $100,000 for lost profits.  We overrule appellants= seventh point of error.

                                                            XI.   

Property
Lost in Reliance 

The jury
awarded the appellees $14,000 in property lost in reliance on fraud.  Vento testified that before he was ejected
from the store by Taylor and Bradford, the value of the merchandise in the
store was $45,000 - $50,000.  He
testified that when the store was returned to him, the value of the merchandise
remaining was $10,000.  Vento also
testified that $500 worth of merchandise disappeared when he was locked out by
the mall for not paying his bills. Therefore, Vento=s testimony would have supported an award of as high as $40,500 for
lost property, and the jury=s award of $14,000 was supported by legally and factually sufficient
evidence.  We overrule appellants= tenth point of error.

                                                            XII.

Separate
Liability of Simon and Golden for Punitive Damages

In response
to question 14, which asks, A[w]hat sum of money, if any, should be assessed to the Plaintiffs
against the Defendant as exemplary or punitive damages?@ the jury answered as follows:

a.  Simon Property Group (Texas), L.P.          $1,000,000.00

b.  Tom Taylor                                                       $     20,000.00

c.  Bruce Bradford, individually
and as

     manager of Valle Vista Mall                              $2,500,000.00

d.  Golden Ring Mall Company
L.P.                         $1,000,000.00








Although
appellants note that they Ado not challenge [Simon and Golden=s] vicarious liability for Bradford=s acts,@ they nonetheless complain that Simon and Golden cannot be separately
liable for punitive damages because they Aacted solely through Bradford.@  In support, appellants cite Bellefonte
Underwriters Ins. Co. v. Brown, 704 S.W.2d 742, 745 (Tex. 1986).  Appellants= reliance on Bellefonte is misplaced.  Bellefonte 
stands for the proposition that a plaintiff may not recover punitive
damages in a tort cause of action absent a showing of actual
damages.  See also Warner
Communications, Inc. v. Keller, 888 S.W.2d 586, 600 (Tex. App.CEl Paso 1994), rev=d on other grounds, 928 S.W.2d 479 (Tex. 1996) (absent an award of actual damages, joint and several award of
exemplary damages is  improper).   In the present case, however, the jury=s award of punitive damages against Simon and Golden is predicated on
the award of actual damages against Simon and Golden for fraud.








Moreover,
corporations can, of course, "act only through agents of some
character."   Hammerly Oaks, Inc.
v. Edwards, 958 S.W2d 387, 390 (Tex. 1997) (citing Fort Worth Elevators
Co. v. Russell, 123 Tex.128, 70 S.W.2d 397, 402 (1934), overruled on
other grounds by Wright v. Gifford‑Hill & Co., 725 S.W.2d 712,
714 (Tex.1987)).  Punitive damages can
properly be awarded against a master or other principal because of an act by an
agent if, but only if, (a) the principal authorized the doing and the manner of
the act, or (b) the agent was unfit and the principal was reckless in employing
him, or (c) the agent was employed in a managerial capacity and was acting
in the scope of employment, or (d) the employer or a manager of the employer
ratified or approved the act.  Hammerly,
958 S.W.2d at 391 (emphasis supplied) (citing Restatement of Torts ' 909 (1939));  see also
Purvis v. Prattco, Inc., 595 S.W.2d 103, 104 (Tex.1980) (setting forth
these same factors and citing section 909 of the Restatement (Second) of Torts, which is unchanged from the
original Restatement of Torts)).  In Fort Worth Elevators, the Texas
Supreme Court used the construct of Avice principal@ to distinguish corporate acts from acts of employees.  Hammerly, 958 S.W.2d at 391.  As manager of the mall, Bradford is responsible for management of Aa department or division@ of the corporation=s business, and accordingly, is a Avice principal.@ See id. (Avice principal@ includes those to whom a master has confided the management of the
whole or a department or division of his business).  

Moreover, Bradford testified that after Vento filed suit, the mall=s Alegal people@ and Ahome office@ were advised of developments and interactions with Vento.  When Bradford was informed of Vento=s request to show the property to Louis Martin, for example, he
discussed the matter with legal counsel for the mall.  The jury could reasonably have concluded that
Simon and Golden ratified or approved Bradford=s conduct with Vento.








The
"one satisfaction rule," which prevents a plaintiff from obtaining
more than one recovery for the same injury, is inapplicable to punitive damage
awards because punitive damages do not concern compensation;  they are, instead, intended to punish the
wrongdoer and to deter future similar acts. 
Universal Serv. Co., Inc.,  882
S.W.2d 460, 467 (Tex. App.CCorpus Christi 1994) rev=d on other grounds, 904 S.W.2d 638 (Tex. 1995). 

Because the
evidence is sufficient to support the jury=s award of actual damages for fraud, and because Bradford is a vice principal, we hold the punitive damages assessed separately
against Simon and Golden in response to question 14 are proper.

 

 

 

 

                                                           XIII.

                        Joint and Several
Liability for Exemplary Damages   

Appellants
further complain that no basis exists for imposing joint and several liability
on appellants for the exemplary damages awarded against Taylor.  In support, appellants cite
former section 41.005 of the civil practice and remedies code, which provides:

In any action in which there are two or
more defendants, an award of exemplary damages must be specific as to a
defendant, and each defendant is liable only for the amount of the award made
against that defendant.[16]

 








Appellants'
reliance on section 41.005 is misplaced because under the law applicable to the
present action,[17] that section does not apply to intentional torts.   Transfer Prods., Inc. v. Texpar Energy,
Inc., 788 S.W.2d 713, 717 (Tex. App.CCorpus Christi 1990, no writ).

Under the
common law, however, where the defendants are closely related or the evidence
establishes a link between the defendants or their wrongful actions, or where
there are findings that the defendants conspired to violate a plaintiff=s rights, joint and several assessments of exemplary damages have been
upheld.  Warner,  888 S.W.2d at 599.  In the present case, the evidence shows a
link between the wrongful actions of Bradford and Taylor.  On October 6, Bradford wrongfully used his authority to assist Taylor in ousting Vento from the store by telling the police that Taylor owned the store and by threatening Vento with criminal trespass
charges.  Bradford=s statements to the police enabled Taylor to sell the store=s merchandise, including Vento=s personal collection.  We hold
that the appellants were properly made jointly and severally liable for the
exemplary damages assessed against Taylor.

                                                           XIV.

Amount of
Exemplary Damages








Appellants
also complain that the exemplary damages assessed against them are
excessive.  Exemplary damages must be
reasonably proportional to actual damages, although there can be no set ratio
between actual and exemplary damages which will be considered reasonable.  Southwestern Ref. Co., Inc. v. Bernal,
960 S.W.2d 293, 298 (Tex. App.CCorpus Christi 1997, pet. granted). 
Unless the award is so large as to indicate that it is a result of
passion, or prejudice, or that the evidence has been disregarded, the verdict
of the jury is conclusive and will not be set aside as excessive, either by the
trial court or on appeal.  Berry Property Mgmt., 850 S.W.2d at 669.

In reviewing
awards of exemplary damages, we consider the following factors:  (1) the nature of the wrong, (2) the
character of the conduct involved, (3) the degree of culpability of the
wrongdoer, (4) the situation and sensibilities of the parties concerned, and
(5) the extent to which such conduct offends a public sense of justice.  Universal, 882 S.W.2d at 463 (citing
Alamo Nat. Bank v. Kraus, 616 S.W.2d 908, 910 (Tex. 1981)).








The Anature of the wrong@ and the Acharacter of the conduct@ favor imposition of exemplary damages.  Bradford wrongfully threatened Vento with criminal trespass charges and told
the police that the store belonged to Taylor, even though he knew Vento claimed ownership and had shown him a copy
of the sales contract.  Bradford wrongfully prevented Vento from doing business at his store by
expelling him from the mall, and, thereby, facilitated Taylor=s plundering of Vento=s stock.   The Adegree of culpability of the wrongdoer@ similarly supports imposition of exemplary damages.  When the police attempted to deal with the
dispute between Taylor and Vento, Bradford alone was in a position to assist in an informed, impartial
manner.  Instead, he deliberately chose
to mischaracterize the state of affairs in a manner that proved devastating to
Vento=s business aspirations.

The Asituation and sensibilities of the parties@ also supports imposition of exemplary damages.  Again, Bradford was in a position of authority, while Vento was a business novice,
unable to protect his rights when challenged by Taylor.  The final factor is Athe extent to which such conduct offends a public sense of justice and
propriety.@  This factor also weighs in
favor of exemplary damages.  At the
moment the police turned to Bradford for guidance, Vento was completely dependent on Bradford to speak the whole truth (i.e., that Vento appeared to have a
legitimate claim to ownership) and thereby protect Vento=s interests.  Instead, he made
misleading statements to the police and furthered the damage to Vento by
gratuitously threatening him with trespass charges if he returned, thereby
making it harder for Vento to assert and protect his property rights.  The jury=s sense of justice and propriety could reasonably have been offended
by such conduct.  

 

Appellants
complain that the trial court=s judgment for exemplary damages contains an error.  Although the jury assessed exemplary damages
against Taylor in the amount of $20,000.00, the judgment assessed exemplary
damages against Taylor in the amount of $2,000,000.00.  We agree with appellants= complaint, and reform the trial court=s judgment consistent with the jury=s findings.








After
eliminating the recoveries that we have determined to be unsupported by legally
sufficient evidence, the appellants and Taylor remain jointly and severally
liable for $864,000 in actual damages.[18]  After correcting the erroneous
amount assessed against Taylor in the judgment, the exemplary damages stand at $4,520,000.  This amount is approximately five times the
amount of actual damages.  After
reviewing the evidence, we conclude that the amount assessed in exemplary
damages bears a reasonable relationship to the actual damages awarded by the
jury and was not excessive.  See
Borden, Inc. v. Guerra, 860 S.W.2d 515, 528 (Tex. App.CCorpus Christi 1993, writ dism=d by agr.) (exemplary damages award five times the actual damages
award not excessive); Goswami v. Thetford, 829 S.W.2d 317, 321 (Tex. App.CEl Paso 1992, writ denied) (award of exemplary damages nineteen times
the amount of actual damages not excessive). 
We overrule appellants= eighth point of error.

                                                           XV.

Conclusion

The judgment
of the trial court is affirmed in part and reversed in part; we render judgment
that the appellants are jointly and severally liable to the appellees for
$864,000 in actual damages and $4,520,000 in exemplary damages.

 

 








___________________________________

Linda Reyna
Yañez

Justice

 

 

 

Concurring
and Dissenting Opinion by Justice Melchor Chavez.

 

Dissenting
Opinion by Chief Justice Robert J. Seerden joined by Justice J. Bonner Dorsey.

 

Publish. Tex. R. App. P. 47.3

 

Opinion
delivered and filed this

the 6th
day of May, 1999.

 

* * * * * * *

 



 




 
 
 
 
 
  
 
 
 
 
 




 

 

 

 

 

 

                                   NUMBER 13-97-116-CV

 

                             COURT OF APPEALS

 

                   THIRTEENTH DISTRICT OF TEXAS

 

                                CORPUS CHRISTI

___________________________________________________________________

 

BRUCE BRADFORD, ET. AL.,                                        Appellants,

 

                                                   v.

 

ROELL VENTO,
ET. AL.,                                              Appellees.

___________________________________________________________________

 

                        On appeal from the 357th
District Court

                                 of Cameron County, Texas.

___________________________________________________________________

 

                          Before the Court en Banc

                                             

               Concurring and Dissenting Opinion
by Justice Chavez

 












I concur in the majority=s opinion in all respects except section
XII, concerning separate liability for Simon and Golden for punitive
damages.  I would hold that Simon and
Golden have no liability for punitive damages other those assessed against
their agent, Bradford, because the record is devoid of any evidence of wrongful
acts committed by Simon and Golden, other than their vicarious responsibility
for Bradford=s acts. 

The appellees point to Bradford=s testimony that, once Vento had filed his
lawsuit, Aany time we dealt with him we did it
through our legal people and our home office.@ 
The majority opinion recalls that Awhen Bradford was informed of Vento=s request to show the property to Louis
Martin, for example, he discussed the matter with legal counsel for the mall.@ 
Because of this contact with Simon and Golden=s lawyers, appellees argue, Simon and
Golden are responsible for the mall=s policy of initially refusing to permit
Vento to show his merchandise to Louis Martin unless he first signed a document
releasing the mall from all liability.  












I disagree.  Bradford=s vague reference to dealing with Vento Athrough our legal people and our home
office@ is insufficient to merit the assessment
of punitive damages against Simon and Golden on top of their liability for the
punitive damages assessed against Bradford. 
The Aexample@ cited by the majority is the only
instance mentioned in the record when Bradford consulted the mall=s lawyers. 
There is no evidence of what advise or instructions Bradford received from the mall=s lawyers. 
There is no evidence of what involvement the Ahome office@ actually had in any of Bradford=s dealings with Vento, nor any direct
evidence that the term Ahome office@ referred to Simon and/or Golden.  Put simply, there is no evidence that Simon
and Golden ever did anything wrong.  I
would hold that the general rule that a defendant can not be liable for
punitive damages unless it has been found to have breached some duty that
renders it liable for actual damages, applies in this case to prevent the
imposition of any separate punitive damages against Simon and Golden.  See Tex.
Civ. Prac. & Rem. Code Ann. ' 41.004(a) (Vernon 1997).

Simon and Golden are undeniably
responsible for Bradford=s actions. 
However, there is no basis for imposing independent liability against
them.  I would hold that Simon and Golden
are jointly and severally liable for the $2,500,000 in punitive damages
assessed against Bradford, but that the $1,000,000 in punitive damages assessed
against Simon and the $1,000,000 in punitive damages assessed against Golden
must be deleted from the appellees= recovery. 

Melchor Chavez

Justice

 

Publish.

Tex.
R. App. P. 47.3.

 

Opinion
delivered and filed on this

the
6th day of May, 1999.

 

 



*
* * * * *

 





 




 
 
 
 
 
  
 
 
 
 
 




 

 

 

 

 

 

                                   NUMBER 13-97-116-CV

 

                             COURT
OF APPEALS

 

                   THIRTEENTH
DISTRICT OF TEXAS

 

                                CORPUS CHRISTI

___________________________________________________________________

 

BRUCE BRADFORD, ET AL.,                                 Appellants,

 

                                                   v.

 

ROELL VENTO, ET AL.,                                               Appellees.

___________________________________________________________________

 

                        On appeal
from the 357th District Court

                                 of Cameron County, Texas.

___________________________________________________________________

 

                            DISSENTING OPINION

 

                   Before the Court En Banc

                     Dissenting
Opinion by Chief Justice Seerden

 












I
respectfully dissent from the majority opinion to the extent that it upholds
liability and damages against Bradford,
Simon and Golden.  I would hold that
there was no evidence to support any of the findings of liability, including
tortious interference with contractual relations, that the award of mental
anguish damages is inappropriate in the present case and, even if appropriate,
was excessive, and that there was no evidence to support the award for lost
profits.

No
Evidence to Support Finding of Tortious Interference

The
majority concedes that the only act by which Bradford, Simon and Golden could be held liable
for tortiously interfering with Vento=s contractual relations is Bradford=s representation to the police that Taylor owned the store at the time of the
confrontation between Taylor and Vento on October 6, 1994. 
This representation caused the police to eject Vento and restore Taylor to possession of the store.  However, I would hold that Bradford=s actions under the circumstances were not
tortious, nor did they proximately cause Vento=s
injury.

Neither
the police, nor Bradford, had the authority to determine right to possession as
between Taylor and Vento.  The police
did, however, have the authority to keep the peace and to arrest anyone that
they had probable cause to believe was trespassing on private property.  To that end, they looked to Bradford as mall manager and landlord to tell them
which of the two rival claimants owned the space in the mall leased to
Collector=s Choice.












Had Bradford disclosed that Vento came to him several
days before and told him he had purchased the business and paid the rent on
that space, but that Taylor still claimed ownership, we do not know what the police officers
would have done.  The evidence suggests
that they were not looking to Bradford
for background information, but, as the senior officer testified, for a
judgment as to which of the two claimants owned the business.

Bradford was then faced with rival claimants and a
written lease that still showed Taylor as the lessee.  Whether or not Taylor had sold his business to a third party,
the written lease between Taylor and the mall obligated the mall to protect Taylor=s right to that lease until such time as Taylor relinquished it.  It was, therefore, entirely reasonable for Bradford, as lessor, to continue to protect the
right of this tenant to the peaceful possession of the leasehold until the
right of Vento, as third-party purchaser, could be established.  Nor is there any indication that a fuller
explanation of the background facts by Bradford would have changed the result that
day.  It is entirely speculative what actions
the police might have taken had they had the whole story concerning Bradford=s knowledge of the relationship between
Taylor and Vento.  I would hold that
there was no evidence to show that Bradford
acted wrongfully or that his failure to relate the whole story to police
proximately caused Vento to be removed from the mall and the resulting
interference with Vento=s contractual relations with his
customers.

Mental
Anguish Damages Inappropriate

I would
also hold that Vento is not entitled to damages for mental anguish flowing from
his present claims for tortious interference against Bradford, Simon and Golden.












Mental
anguish damages are not generally recoverable in a tort action based on rights
growing out of the breach of a contract. 
Rubalcaba v. Pacific/Atlantic Crop Exchange, Inc., 952 S.W.2d
552, 558 (Tex. App.‑-El Paso 1997, no writ); Delgado v. Methodist
Hosp., 936 S.W.2d 479, 486 (Tex. App.‑-Houston [14th Dist.] 1996, no
writ); Doe v. SmithKline Beecham Corp., 855 S.W.2d 248, 258 (Tex. App.‑‑Austin
1993), affirmed as modified, 903 S.W.2d 347 (Tex. 1995). 
The present action grows out of a breach of contract by which Vento
purchased a business from Taylor and the associated lease agreement under which that business was to
operate in the Valle Vista Mall. 
Accordingly, I would deny recovery of mental anguish damages.

No
Evidence of Lost Profits

Finally,
I would hold that the evidence was legally insufficient to support an award of
lost profits.  The amount of the loss
must be shown by competent evidence with reasonable certainty.  Szczepanik v. First Southern Trust Co.,
883 S.W.2d 648, 649 (Tex. 1994); Texas Instruments v. Teletron Energy Management, Inc., 877 S.W.2d 276, 279 (Tex. 1994). 
At a minimum, opinions or estimates of lost profits must be based on
objective facts, figures, or data from which the amount of lost profits may be
ascertained.  Szczepanik, 883
S.W.2d at 649; Holt Atherton Ind., Inc. v. Heine, 835 S.W.2d 80, 84 (Tex. 1992).












Profits
that are largely speculative, as from an activity dependent on uncertain or
changing market conditions, or on chancy business opportunities, or on
promotion of untested products or entry into unknown or unviable markets, or on
the success of a new and unproven enterprise, cannot be recovered.  Texas Instruments, Inc., 877 S.W.2d at
279.   Moreover, in determining whether
such an enterprise is unproven, the focus is on the experience of the persons
involved in the enterprise and the nature of the business activity, and the
relevant market.  Id. at 280.

In the
present case, Vento=s expert, economist Dr. Gilbert De Los
Santos, attempted to show lost profits by taking Vento=s estimates of the monthly sales generated
by Collector=s Choice in 1994, then taking the amount
of his 30% net profits for the first five months of that year, as reflected by
the deposits shown in Vento=s checkbook, and extrapolating a profit
margin of 15.5%.  He then used a 5%
growth rate in sales over a ten-year period to project the profits lost over
that period.

For two
reasons, I do not agree that this was an adequate measure of profits.  First, Vento=s
estimates of the sales for 1994 were insufficient as a matter of law.  Vento has not shown how he Aestimated@
the monthly sales of Collector=s Choice, nor did Dr. De Los Santos know
how these estimates were generated. 
Vento=s testimony shows that he did not have
personal knowledge of the exact amount, nor is there any indication how he
arrived at these estimates.  They are
speculative at best and do not offer a reliable means of calculating profits.

Second,
even assuming the accuracy of his calculations for 1994 under the ownership and
management of Taylor, there was no indication what profits would have been under Vento=s management and operation of the
business.












The
record shows this to be a small business dependent upon the direct labor and
skill of the proprietor.  The loss of
that proprietor is, accordingly, a difficult variable to account for in
determining the future profitability of the business without Taylor. 
This obstacle could, perhaps, be overcome with sufficient evidence of
the manner of operation and how Vento planned to compensate for the loss of
Taylor, together with evidence of Vento=s own ability to manage a small business
on his own.

However,
the present record is devoid of any such evidence and depends almost entirely
on evidence of past profitability under Taylor=s management and control.  This is not indicative of the profitability
of the business as a sole proprietorship under Vento=s management.  We do not know whether Vento has the same
abilities as Taylor to successfully operate a business on his own or to retain the
customer base that Taylor built up over the years. 
Accordingly, the business under Vento=s
management is an unproven enterprise.  See
Texas Instruments, Inc., 877 S.W.2d at 279-80.  I would hold the evidence speculative and
insufficient to support any certain measure of lost profits under Vento=s sole management and control of the
business.

I would
reverse the trial court=s judgment and render a take-nothing
judgment in favor of Bradford, Simon and Golden.

 

 

 

__________________________________

ROBERT J. SEERDEN,
Chief Justice

 

Justice Dorsey joins in this dissent.

 












Publish.

Tex. R. App. P. 47.3.

 

Dissenting Opinion delivered and filed 

this the 6th day of May, 1999.

 



 

 











    
[1] We note that the total amount of actual damages
awarded in Paragraph A of the trial court=s judgment is inconsistent with the amount of
damages awarded by the jury in response to questions listed in Paragraph A:
Questions 1A, 3A, 8A, 9A, and 11A(c). 
Because no challenge to the inconsistency was raised on appeal, however,
we will not address the issue.

 

Paragraph A of the trial
court=s judgment purports to
include the following actual damages awarded by the jury:

Question 1A, fraud:

Reliance damages:                                                                     $  14,000.00

Mental anguish:                                                            $750,000.00  

 

Question 3A, Taylor=s breach of fiduciary
duties to Vento:

Lost profits:                                                                              $100,000.00

Mental anguish:                                                             $250,000.00

Loss of personal property:                                                          $    7,000.00

 

Question 8A, tortious interference with
prospective contractual relations:

Lost profits:                                                                                $20,000.00

Mental anguish:                                     `                        $10,000.00

 

Question 9A, civil conspiracy:

Lost profits:                                                                                 $75,000.00

Loss of personal property:                                                             $10,000.00   

Mental anguish:                                                                $50,000.00

Expenses:                                                                                     $ 
7,000.00

 

Question 11A(c), intentional infliction of
emotional distress by Bradford:

Emotional distress:                                                         
             $100,000.00

  





     [2]
This figure
reflects exemplary damages of $2,500,000 against Bradford, $2,000,000 against Taylor, $1,000,000 against
Simon Property Group, and $1,000,000 against Golden Ring Mall Company.





     [3]
References to AVento@ mean Roell Vento.  Although his wife, Debra, is a party to the
lawsuit and claims to share ownership in the business with her husband, she had
little involvement in the events underlying this case.





    
[4]
Vento argues that A[l]ike conspirators are
wont to do when confronted by inconsistencies in their testimony, Bradford and Taylor began to change their
stories at trial to conform.@  After Bradford had already testified
that the 6th was the date of the conversation, Taylor=s testimony at trial went
this way:

 

Q:         . . . you did go back that day and tell Mr. Bradford about
that; didn=t you, on October the
5th?

A:         (by Taylor) On October the 5th?

Q:         Yes.  Did you talk to
him?

A:         I don=t really remember.  Like I said before, I - - -

Q:         Let me ask you - - 

A:         The dates are confusing.  I=ve done - - 

Q:         I understand.

A:         This was two years ago.

Q:         According to your deposition, . . .on October the 5th . . .
you did come back, because you told Bruce Bradford that Roell was taking over
your store . . .

A:         Well, like I said, I don=t remember if it was the 5th or the morning of
the 6th.

Q:         Your deposition said it was the 5th.  

A:         I
understand that.  And also at the
deposition I told you at that time I wasn=t exactly positive of the times[,] either.





     [5]
The parties
contested the issue of who called the police. 
The police report listed Bruce Bradford as the complainant, and two
police officers testified that the person who calls the police is listed as Athe complainant.@  However, on cross-examination, the officers
explained that they assumed Bradford had made the call
because the call came from Valle Vista Mall, where Bradford was the manager, but
that they could not be certain who had placed the call without consulting the
log.  Bradford himself denied calling the
police.  





     [6] Under the terms of the
store=s lease, the tenant was
obligated to pay the mall Aoverages@ of 12.5% of all monthly sales in excess of
$8,375.  





     [7]
The total amount
due for electricity was $1356.62. 
However, $719.69 of this was for the period from June 16 to September
15, when Vento was a partner in the business and was, arguably, equally
responsible for the business=s debts. 
The bills from March 15 to June 15, for which Taylor was individually
responsible, totaled $636.93.  





     [8]
The contract did
not indicate that the sale had been consummated, but rather that Athis sale will be
finalized as soon as funds in the amount of $7,000 are paid.@  Although Vento told Bradford on October 4 that the
sale had been completed, Taylor disputed whether a sale
had been finalized. 





     [9]The Texas Supreme Court held in Sterner
v. Marathon Oil Co., 767 S.W.2d 686, 689-90
(Tex. 1989) that a claim of justification or excuse to
interfere with existing contractual relations is an affirmative
defense.  The Supreme Court has not addressed
whether the reasoning of Sterner extends to cases involving prospective
contractual or business relations.  A
majority of post-Sterner decisions by the courts of appeal addressing
the issue have not extended Sterner to cases involving prospective contractual
or business relations.  See, e.g.,
Garner v. Corpus Christi Nat. Bank, 944 S.W.2d 469, 477 (Tex. App.CCorpus Christi 1997, writ
denied); Hill v. Heritage Resources, Inc., 964 S.W.2d 89, 109 (Tex. App.CEl Paso 1997, pet.
denied); Robles v. Consolidated Graphics, Inc., 965 S.W.2d 552, 561
(Tex. App.CHouston [14th Dist.]
1997, writ denied); Tarleton State Univ. v. Rosiere, 867 S.W.2d 948, 952
(Tex. App.CEastland 1994, writ dism=d agr.); Coastal Corp.
v. Atlantic Richfield Co., 852 S.W.2d 714, 720 (Tex. App.‑‑Corpus
Christi 1993, no writ);  Browning-Ferris,
Inc. v. Reyna, 852 S.W.2d 540, 548 (Tex. App.CSan Antonio 1992) rev=d on other grounds, 865 S.W.2d 925 (Tex.
1993); Exxon Corp. v. Allsup, 808 S.W.2d 648, 659 (Tex. App.‑‑Corpus
Christi 1991, writ denied); Gillum v. Republic Health Corp., 778 S.W.2d
558, 565 (Tex. App.‑‑Dallas 1989, no writ) (all including absence
of justification or excuse as element of plaintiff=s case in cases involving
tortious interference with prospective contractual or business relations).  But see, e.g., Weakly v. East, 900
S.W.2d 755, 759 (Tex. App.CCorpus Christi 1995, writ denied) (omitting
absence of justification or excuse as element of plaintiff=s case for tortious
interference with prospective advantage); Caller-Times Publishing Co., Inc.
v. Triad Communications, Inc., 855 S.W.2d 18, 21 (Tex. App.CCorpus Christi 1993, no
writ) (omitting absence of justification or excuse as element of plaintiff=s case for tortious
interference with prospective contracts or business relationships).  





     [10]
Standard Fruit involved an independent
claim of intentional infliction of emotional distress based solely on the reckless
conduct of the defendant.  The court held
that recovery for intentional infliction of emotional distress is Aavailable only in those
situations in which severe emotional distress is the intended
consequence or primary risk of the actor=s conduct.@ Standard Fruit,
No. 97-0976, 1998 Tex. Lexis 166, at *14 (emphasis added).  Thus, recovery for intentional infliction of
emotional distress is only barred Awhen the risk that
emotional distress will result is merely incidental to the commission of some
other tort.@  Id. at 19.  Recovery is available if the Aconduct is intended or primarily
likely to produce severe emotional distress . . . even if the actor=s conduct also produces
some other harm, such as physical injury.@  Id. At *16.





     [11]
We consider the
jury=s findings of $100,000 in
Alost use of property@ to be the same as a finding
of $100,000 in lost profits.  The Aproperty@ that Vento lost the use
of was his store and merchandise.  The
value Vento lost from being deprived of the use of this property was the
ability to make profits.





     [12] By this holding, we
sustain appellants= eleventh point of error,
which argued that the appellees had been improperly permitted to stack their
recoveries.





     [13]
Section 17.50(a)(1)
of the business and commerce code was amended by Acts 1989, 71st Leg., ch. 380,
' 2, effective September 1, 1989, and by Acts 1995, 74th Leg., ch. 414, ' 5, effective September 1, 1995.  See
Tex. Bus. & Com. Code Ann. '
17.50(a)(1)
(Vernon Supp. 1999). 
A lawsuit, like the present action, filed on November
 8, 1994, prior to the effective date of the 1995 amendments, is governed by
the law applicable to the claim prior to the effective date of the amendments.
The changes are not relevant to our discussion. 





     [14] The 1995 amendments did
not effect the text of Section 17.50(a)(3). See Tex. Bus. & Com. Code Ann. '
17.50(a)(3) (Vernon Supp. 1999). 





     [15]
Section 17.45(5)
was amended in 1995 to delete the Agross disparity@ prong of the
definition.  See Tex.
Bus. & Com. Code Ann. '
17.45(5) (Vernon Supp. 1999). The amendment is not relevant to
our discussion. 





     [16]
This section,
formerly ' 41.005, was renumbered
as ' 41.006 by Acts 1995,
74th Leg., ch. 19,  '1, effective September 1, 1995.  The text
is unchanged.





     [17]
Chapter 41 of the
civil practice and remedies code was amended, effective September 1, 1995.  A lawsuit,
like the present action, filed on November
 8, 1994, prior to the effective date of the 1995 amendments, is governed by
the law applicable to the claim prior to the effective date of the
amendments.   





     [18] This amount reflects $750,000
in mental anguish damages, $100,000 in lost profits, and $14,000 in property
lost in reliance on fraud.